## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | |
| WE THE PATRIOTS USA, INC. | : | DKT No.: 3:24-cv-00222-VDO |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MERRICK GARLAND, in his official | : | |
| capacity only; LOUIS DEJOY, in his | : | |
| official capacity only | : | |
| | : | |
| Defendant. | : | October 30, 2024 |

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

Plaintiffs David J. Nastri, Esq. and We The Patriots USA, Inc., submit this memorandum of law in support of their motion for summary judgment upon their claims for a declaratory judgment and for a nationwide permanent injunction prohibiting the Defendants from enforcing 18 U.S.C. § 930(a)'s prohibition on carrying firearms into United States Post Offices against Nastri and any of We The Patriots USA, Inc.'s members anywhere in the United States.

The Plaintiffs comfortably carry their burden to show the absence of any material disputed facts and their entitlement to summary judgment as a matter of law. First, they show that the Second Amendment's plain text protects their intended conduct – the carrying of firearms for self-defense into United States Post Offices. Second, they show that the Defendants cannot meet their burden to show that 18 U.S.C. § 930(g)'s prohibition on carrying firearms in Post Offices is supported by a well-established and historical tradition.

1

In particular, the Plaintiffs demonstrate that Post Offices are not "sensitive places" where the possession of firearms by law-abiding citizens may be categorically banned because historically "sensitive places" were (1) places where deliberative decisions of self-government were made and (2) protected by comprehensive government security. Nothing in this case's record shows that Post Offices are places where deliberative decisions of self-government are made. The record also shows that the Defendants take no steps to separate and protect Post Offices. They do not provide security or any form of screening for weapons at Post Offices. They integrate Post Offices into the community – often so closely that, on one side of a wall, a person may freely carry a gun and, on the Post Office side of the wall, they may not.

Because the Defendants will not be able to justify 18 U.S.C. § 930(g)'s from our nation's history and tradition, the Court should grant the Plaintiffs' motion for summary judgment, declare unconstitutional 18 U.S.C. § 930(g)'s prohibition on carrying firearms for self-defense in Post Offices, and permanently enjoin the Defendants from enforcing 18 U.S.C. § 930(g)'s prohibition on carrying firearms for self-defense in Post Offices against David Nastri and the 18,523 members of We The Patriots USA, Inc.

## BACKGROUND

### I.     Factual Background

It is hard to find a better member of his community than David Nastri. Nastri is a combat veteran, a financial advisor, an attorney, a kidney donor, and an active participant in his community. **L.R. 56(a)(1) Statement of Facts, ¶¶ 7-8**.  His life is a veritable timeline of sacrifice and service to his nation and his community, and he has established a record of more than 30 years as a law-abiding and peaceable Connecticut citizen.

2

Nastri earned his Master's in Business Administration (M.B.A.) in 2001 from Quinnipiac University. *Id*. at ¶ 14. As a financial advisor, he currently holds four FINRA licenses, including a Series 7, a Series 63, a Series 66, and a Life & Health license. *Id*. at ¶ 19. In addition to passing the rigorous background checks required for these licenses, Nastri holds a clean disciplinary record for all of his financial licenses. *Id*. at ¶¶ 19-20.

His appetite for learning and ultimately giving back to his community did not stop there though. Nastri returned to school and earned his law degree in 2018 from Quinnipiac University. *Id*. at ¶ 14. He subsequently became an attorney duly licensed to practice law in Connecticut on November 2, 2018, and he remains in good standing with no record of a disciplinary history. *Id*. at ¶ 15. Since obtaining his law license, Nastri has represented numerous veterans in a pro bono capacity in Veterans' Administration matters during what spare time he has left over from his day job as a financial advisor. *Id*. at ¶¶ 15-18.

Nastri's service to his fellow citizens, community, and nation has been long and enduring. In 2009-2010, Nastri deployed to Afghanistan as a Staff Sergeant in the 1st Battalion, 102nd Infantry Regiment, Connecticut Army National Guard in support of Operation Enduring Freedom. *Id*. at ¶ 10. During his deployment, Nastri saw combat, and he earned several awards during his military service, including the Afghanistan Campaign Medal with a Campaign Star, the Army Good Conduct Medal, and the Louisiana Emergency Service Medal. *Id*. at ¶¶ 9, 11. He received an honorable discharged in March 2012. *Id*. at ¶12.

Nastri has held a Connecticut pistol permit for approximately 30 years in good standing since receiving it, and he completed all of the safety training associated with obtaining it. *Id*. at ¶ 21. In addition to the civilian training that he received when he obtained

his pistol permit, Nastri received comprehensive training from the United States Army during his military service on the safe and effective use of firearms, including handguns, and he was required to demonstrate proficiency in their safe and effective use under combat conditions. *Id*. at ¶ 13. He subsequently used that training in combat. *Id*. at ¶ 13. Nastri carries a handgun for the purpose of self-defense almost every place he goes. *Id*. at ¶ 22.

Nastri rents Post Office Box 427 at the United States Post Office located at 210 Maple Avenue, Cheshire, Connecticut 06410 ("the Cheshire Post Office") to receive business mail. *Id* at ¶ 23. He enters the Cheshire Post Office at least once or twice a month to check his mail. *Id*. at ¶ 24.  He intends to carry a handgun for self-defense whenever he enters the Cheshire Post Office just like he does when he goes any other place where its possession is not prohibited. *Id*. at ¶¶ 22, 25. He would like to do so without incurring federal criminal prosecution through the Defendants' enforcement of 18 U.S.C. § 930(a). *Id*. at ¶ 27.

Nastri is also a member of We The Patriots USA, Inc. ("WTP"). *Id*. at ¶ 2. WTP is a non-profit public charity dedicated to promoting constitutional rights, civil liberties, and other freedoms through education, outreach, and public interest litigation. *Id.* at ¶ 3. It offers memberships to its supporters and the general public, and, as of October 29, 2024, WTP has 18,523 members across the United States. *Id*. at ¶ 5. Each member of WTP is subject to the same prohibition against carrying firearms into post offices as David Nastri is. *Id*. at ¶ 6.

## II.    Procedural History

4

Nastri filed this case on February 20, 2024. Dkt. 1. He served the Defendants on March 26, 2024. Dkt. 11. They filed an answer on July 19, 2024. Dkt. 12.

The parties then conferred and submitted a joint report of their Fed. R. Civ. P. 26(f) meeting on August 30, 2024. The Court adopted the parties' agreement that this case presents "a question of law that can be resolved on cross motions for summary judgment after little to no discovery." Dkt. 14.

This motion for summary judgment follows.

## LEGAL STANDARD

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact.'" *Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson*, 477 U.S. at 248). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Courts resolve "all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the

import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992).

## **ARGUMENT**

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) now governs Second Amendment cases. *Bruen* replaces traditional means-end scrutiny with a two-part test focused on text, history, and tradition. At the first step, the Plaintiffs bear a burden to show that the Second Amendment's plain text covers their conduct. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126. The Plaintiffs carry this burden by showing that they intend to carry firearms for the purpose of self-defense in United States Post Offices.

At the second step, the Defendants bear a burden to demonstrate that their regulation is consistent with our nation's history and tradition. *Id*. at 2126 ("[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation"). This second step requires courts to assess "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" through "reasoning by analogy —a commonplace task for any lawyer or judge." *Id*. at 2131-32. At the same time, it is not the Court's obligation "to sift the historical materials for evidence to sustain [the government's] statute." *Id*. at 2150; *see also id*. at 2127 ("the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms").

*Bruen* contemplated two types of cases in this second step: straightforward cases and "other cases implicating unprecedent societal concerns or dramatic technological changes." *Id.* at 2131-32. It described straightforward cases as follows:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131.

When a court considers "modern regulations that were unimaginable at the founding," however, *Bruen* requires the Defendants to identify "a well-established and representative historical analogue" to its modern regulations. *Id.* at 2133. To determine whether the analogue is representative and "relevantly similar under the Second Amendment," *Bruen* provides courts with "at least two metrics" that "are [the] *central* considerations when engaging in an analogical inquiry" from *Heller* and *McDonald*: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33 (cleaned up) (emphasis in original).

This case is a straightforward one. Postal systems predate the Founding Era and have endured since. Over centuries, they faced, in some form or fashion, every conceivable concern present in modern society. History, however, yields no bans on firearms or other weapons in conjunction with postal systems until the mid-to-late 1900s—

well after the relevant historical time period under Supreme Court precedent.[1] The lack of any historical prohibitions on the possession of firearms in conjunction with postal systems renders 18 U.S.C. § 930(a)'s ban on the possession of firearms in United States Post Offices unconstitutional.

Finally, the Plaintiffs show that the national scope of the laws at issue and judicial economy favor the issuance of a nationwide injunction—particularly since at least one district court has already found that the United States was unable to provide it any historical support or justification for 18 U.S.C. § 930(a). *United States v. Ayala*, 711 F.Supp.3d 1333 (M.D.F.L. 2024).

## I.    The Second Amendment's plain text protects the Plaintiffs' conduct.

The Second Amendment reads as follows: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

*Bruen* held that the individual conduct that the Second Amendment's plain text protects is "the individual right to possess and carry weapons in case of confrontation that does not depend on service in the militia." 142 S.Ct. at 2127 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)) (internal quotation marks omitted). The Second Amendment's text and history leave "no doubt" that the "Second Amendment confers an

---

[1] *Bruen* acknowledged an academic debate over whether "courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope…." 142 S.Ct. at 2138. It declined to address the issue dispositively because its conclusion would not have made a difference in its judgment. *Id*. at 2138. This case presents a similar scenario where the absence of any relevantly similar analogues in both 1791 and 1868 is dispositive. If, however, the Court does reach this question, the Supreme Court has always looked to "the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*. at 2137-38 (compiling cases). Thus, 1791 history controls, not 1868 history.

individual right to keep and bear arms." *Id.* at 2127 (*quoting Heller*, 554 U.S. at 595) (internal quotation marks omitted). As understood between the Founding and the Civil War, this textual right conferred a right upon citizens to "keep and carry arms *wherever they went.*" *Id.* at 2150-51 (quoting *Dred Scott v. Sandford*, 60 U.S. 393, 417 (1857)).

Nastri and similarly situated members of We The Patriots USA, Inc. seek to exercise the precise right contemplated and protected by the Second Amendment and affirmed in both *Heller* and *Bruen*: the bearing of a handgun for personal protection in the event of a confrontation in United States Post Offices and in their coming and going from Post Offices. **L.R. 56(a)(1) Statement of Facts, ¶¶ 22, 25.** As a United States citizen and meeting all the requirements to possess firearms under federal and state law, Nastri is indisputably among the "people" referred to in the Second Amendment, [2] and handguns are indisputably "arms" as defined in the Second Amendment. So too are the 18,523 members of We The Patriots USA, Inc. **L.R. 56(a)(1) Statement of Facts, ¶ 5.**

Thus, the Second Amendment's plain text covers the Plaintiffs' conduct, and the inquiry now shifts to whether the United States can meet its burden to show that 18 U.S.C. § 930(a)'s prohibition on carrying firearms in Post Offices is justified by our nation's history and tradition of firearm regulation.

---

[2] Nastri's character is beyond dispute. He has passed numerous government background checks, served in our nation's military, received extensive government training on firearms usage, has held a Connecticut pistol permit for about thirty years, and is a licensed member of the Connecticut bar. **L.R. 56(a)(1) Statement of Facts, ¶¶ 7-29.** In other words, it would be hard to find another American more qualified to be among the people referred to in the Second Amendment and who could be trusted to bear firearms lawfully.

II.    **There is no evidence of firearms being prohibited at post offices at the time of the Founding Era, and there are no novel societal concerns justifying a complete ban on firearms possession in post offices.**

The Court should begin its analysis of *Bruen*'s second step by taking notice of what the United States has already conceded in similar litigation. In *United States v. Ayala*, 711 F.Supp.3d 1333, 1340 (M.D.F.L. Jan. 12, 2024) (cleaned up), the district court found that the United States had conceded that "[t]here is no evidence of firearms being prohibited at post offices, specifically, or of postal workers being prohibited from carrying them, at the time of the founding."[3] The undersigned has been completely unable to uncover any evidence contrary to the United States' concession in *Ayala*, and the Defendants likely will not uncover non-existent evidence that has already eluded them, a criminal defendant, a very thorough district court judge and her staff, and counsel in this case who is well-immersed in the post-*Bruen* historical inquiry.

The United States' important concession and the lack of historical evidence are dispositive in this case if the Defendants cannot show that 18 U.S.C. § 930(a) addresses "unprecedented societal concerns or dramatic technological changes."[4] *Bruen*, 142 S.Ct.

---

[3] *See* footnote 1 *supra*.

[4] As discussed previously, *Bruen* makes the test for straightforward cases simple:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

142 S.Ct. at 2131.

at 2132; *see also generally id*. at 2131-33 (explaining the difference between straightforward cases and ones requiring a more nuanced approach).

*Ayala* found that the United States did not claim that 18 U.S.C. § 930(a)'s prohibition on the possession of firearms in post offices "addresses unprecedented societal concerns or dramatic technological changes requiring comparison to a well-established and representative historical *analogue*." *Ayala*, 711 F.Supp.3d at 1342 (cleaned up). *Ayala* properly held that the United States could not successfully raise such claims either because 18 U.S.C. § 930(a) addresses "age-old problems through a new and near-complete firearms ban." *Id*. at 1342.

*Ayala* posited three purposes for 18 U.S.C. § 930(a). First, it speculated that "Congress might have sought to promote public safety generally." *Id*. at 1341. It, however, correctly found that such generalized "[p]ublic safety concerns were not unknown to the Founders," but that they did not address them "through sweeping bans on firearm possession." *Id*. at 1341. Instead, they compelled the possession and bearing of firearms. *Id*. at 1341 (quoting *Heller*, 554 U.S. at 601) ("Many colonial statutes required individual arms bearing for public-safety reasons—such as the 1770 Georgia law that 'for the security and defence of this province from internal dangers and insurrections' required those men who qualified for militia duty individually 'to carry fire arms' 'to places of public worship.'") (cleaned up).

Second, *Ayala* found that Congress could have legislated with "some combination of postal-employee safety and ensuring the efficacy of mail delivery" in mind. *Id*. at 1341. It, however, correctly found that such concerns existed "before the founding," relying on

Defendant DeJoy's own compilation of United States Postal History.[5] *Id*. at 1341. Postal services existed in America prior to the Founding as far back as 1673. **L.R. 56(a)(1) Statement of Facts, ¶ 51.** While the early efforts were more local in nature, the British government formally took over the colonial postal service in 1707. **L.R. 56(a)(1) Statement of Facts, ¶ 52**. After the British government appointed Benjamin Franklin as one of its postmasters general in 1753, he reformed the system into one that more closely resembled the United States' current postal service, providing service from Canada to Florida. **L.R. 56(a)(1) Statement of Facts, ¶¶ 53**. After the battles of Lexington and Concord, the Second Continental Congress reappointed Franklin as the colonies' postmaster general—a position he held until November 1776. **L.R. 56(a)(1) Statement of Facts, ¶ 54**. The Post Office Department grew rapidly, providing service through 28,498 offices across the United States by 1860. **L.R. 56(a)(1) Statement of Facts, ¶ 55**. By 1831, postal employees accounted for 76% of the federal workforce and outnumbered the standing United States army. **L.R. 56(a)(1) Statement of Facts, ¶ 56**.

From its infancy, the U.S. Postal Service faced armed threats and violent crime. Stagecoaches—the primary vehicles for mail delivery until the Pony Express in the antebellum period—faced threats posed by robbers and Indians. **L.R. 56(a)(1) Statement of Facts, ¶ 57**. Instead of taking measures to ban the possession of weapons in connection with the postal service, Congress enacted laws that offered bounties for the apprehension of postal robbers—an undertaking that required the armed apprehension

---

[5] This history—published by Defendant DeJoy's subordinates—is annexed to the L.R. 56(a)(1) Statement of Facts as **Exhibit D.**

of such robbers by private citizens. *See, e.g.,* An Act for the Relief of D.W. Haley, ch. 66, 25 Stat. 713 (1838).

The rise in railroads yielded a new advancement in the postal service, but also posed new challenges. Bandits soon began to target and threaten postal workers aboard trains. *See Colorado Train Robbers*, N.Y. TIMES, 2 Sept. 1891, at 8. The problem became so bad that Defendant Dejoy's own history describes it as follows: "By the 1920s, so many bandits were targeting mail trains that the postmaster general armed railway mail clerks with government-issued pistols with orders to 'shoot to kill.'" **L.R. 56(a)(1) Statement of Facts, ¶ 61.** Additionally, the United States Marine Corps was twice called into service in 1921 and 1926 to safeguard mail in conjunction with the issuance of pistols to postal employees. **L.R. 56(a)(1) Statement of Facts, ¶ 62**.

The United States Postal Service's approach to these problems did not change until 1972. *See* 37 Fed. Reg. 24, 346-47 (1972) (containing the first regulation specifically banning arms on post office property); *see also* 29 Fed. Reg. 15, 982 (1964) (banning firearms in government buildings, but not post offices specifically). 18 U.S.C. § 930 itself was not enacted until 1988. *See* Pub. L. 100-690, § 6215(a).

In other words, the history of the United States Postal Service has always been fraught with danger, and the enduring historical tradition has been to encourage the possession of weapons in conjunction with mail services. Prohibiting their possession is only of recent vintage, thus lacking the necessary historical foundation to survive a *Bruen* historical analysis.

Finally, *Ayala* discussed Founding Era regulations that addressed intimidation during official government proceedings. *Ayala*, 711 F.Supp.3d at 1342. It correctly

13

described this concern as a generalized one and found that there was no evidence that Congress or the states "ever sought to address intimidation at post offices with firearms bans." *Id*. at 1342. It further and correctly found that anti-intimidation laws bear no resemblance to 18 U.S.C. § 930(a) because they applied to places of governmental deliberation, not the transaction of ordinary business such as that which occurs at the Post Office. *Id*. at 1342. Thus, these laws cannot provide a historical analogue for 18 U.S.C. § 930(a), and the Plaintiffs will discuss these laws in greater detail below in their discussion of the Second Amendment's "sensitive places" exception.

In sum, all of the concerns that 18 U.S.C. § 930(a) seeks to address with its ban on firearms possession at United States Post Offices were known to the Founding Fathers. No historical tradition demonstrates that the Founding Fathers thought that a constitutional way to address those problems was to ban the private possession of firearms in government postal facilities. Thus, the Defendants cannot carry their burden to show that 18 U.S.C. § 930(a) is justified by our nation's history and tradition of firearms regulation, and summary judgment is appropriate on Plaintiffs' claim for declaratory judgment.

## III.    Post offices are not sensitive places.

Although the United States lacks any historical precedent of banning firearms in post offices sufficient to carry their historical burden under *Bruen*, Defendants may nevertheless argue that post offices are "sensitive places" where the government may ban firearms. But Defendants cannot carry their summary-judgment burden by attempting to categorize post offices as sensitive places because *Bruen*'s narrow definition of "sensitive places" does not include post offices.

### A. Supreme Court precedent does not exempt all government buildings from the Second Amendment.

In *Ayala*, the United States claimed that *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) exempted all government buildings from the Second Amendment's scope. *Ayala*, 711 F.Supp.3d at 1348-49. *Ayala* rejected that reasoning, and the Court should too. *Id*.

The United States' argument in *Ayala* was that *Heller*'s dicta and *McDonald*'s verbatim recitation of it expressly affirmed the government's power to regulate and ban firearms in government buildings without Second Amendment scrutiny. *Id*. It relied on *Heller*'s comment that

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626-27.

As *Ayala* properly noted, neither *Heller* nor *McDonald* considered issues involving "sensitive places," and "sensitive places" were unnecessary to the discussion of the issues in both *Heller* and *McDonald*. *Ayala*, 711 F.Supp.3d at 1349. Instead, both *Heller* and *McDonald* included this statement to remind lower courts that neither decision was striking down all firearms regulations. Because this reasoning was not necessary to reach *Heller* and *McDonald*'s outcomes, it does not constitute a binding holding. *Ramos v. Louisiana*, 140 S.Ct. 1390, 1404 (2020) ("It is usually a judicial decision's reasoning—its ratio decidendi—that allows it to have life and effect in the disposition of future cases); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) (explaining that the holding includes the result and "those portions of the opinion necessary to that result").

15

*Bruen*'s treatment of sensitive places further counsels against placing much stock in *Heller*'s comment. When *Bruen* rejected New York City's attempt to characterize the part of its regulatory scheme that functionally prohibited the possession firearms in New York City as a "sensitive place" restriction, *Bruen* adopted a far narrower interpretation of what constituted a well-settled "sensitive place:"

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions…. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.

*Bruen*, 142 S.Ct. at 2133.

*Bruen* declined to define "sensitive places" beyond directing courts to analogize to "legislative assemblies, polling places, and courthouses." *Id*. at 2133 (stating that the Court had "no occasion to comprehensively define 'sensitive places' in this case"). Instead, it directed judges to reason by analogy in future cases in a manner consistent with *Bruen*'s historical methodology. *Id*. at 2134.

Interpreting *Heller* and *Bruen*'s dicta to include all government buildings in the category of "sensitive places" would also defy *Bruen*'s actual holding. *Bruen* instructed courts to examine "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2132-33 (emphasis added). The three examples - "legislative assemblies, polling places, and courthouses" – that *Bruen* instructs courts to analogize to are places where deliberative decisions of self-government occur. *Id*. at 2133. Categorical bans on the mere possession of firearms were considered constitutionally

justified to ensure a free deliberative process – a position that the United States itself appeared to advocate for in *Ayala*. *See Ayala*, 711 F.Supp.3d at 1342-43.

The United States itself does not treat Post Offices as places of deliberative self-government. As the Plaintiffs' evidence shows, the Defendants do not regularly display in Post Offices the signage announcing the prohibition on carrying firearms within. **L.R. 56(a)(1) Statement of Facts, ¶ 30.** They take no measures to isolate Post Offices from businesses where no laws prohibit the carrying of firearms. **L.R. 56(a)(1) Statement of Facts, ¶¶ 34, 36, 38, 40, 42, 44, 46, 48** (demonstrating how Post Offices share the same buildings and neighborhoods as a variety of privately owned commercial businesses, including restaurants and convenience stores). At least as to the Cheshire Post Office that Nastri goes to, the Defendants employ no security measures to screen visitors for weapons, and they do not station within it any armed, or even unarmed, security guards to protect the building, its occupants, the public, and whatever operations occur within. **L.R. 56(a)(1) Statement of Facts, ¶ 29.**

In other words, the United States and the Defendants do not treat Post Offices like "sensitive places." Operationally, they consider them to be the equivalent of pizza parlors, convenience stores, and other businesses where no laws prohibit the carrying of firearms. That is a far cry from the comprehensive security measures that the United States employs at courthouses and its legislative office buildings. Nor have the Defendants or the United States ever shown what deliberative decisions of self-government occur within post offices that would justify categorizing them as a "sensitive place."

The Defendants may not meet their burden as to 18 U.S.C. § 930(a) by inviting the Court to defy *Bruen* and adopt a categorical prohibition across government buildings

17

instead of reasoning by analogy. The Court should reject any attempt by the United States to argue for a categorical "government building" exemption from the Second Amendment. Such an exemption has no support in precedent or in history and tradition.

> **B. "Sensitive places" within the Founding Era tradition were places where governments secured them through comprehensive security and where key decision-making functions of democracy occurred.**

*Bruen* postulated that governments could categorically bar weapons altogether in only three sorts of locations during the Founding Era: legislative assemblies, polling places, and courthouses. 142 S.Ct. at 2133. It instructed courts to "use analogies those historical regulations of 'sensitive places' to determine [whether] modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id*. at 2133.

Understanding *why* the three presumptively sensitive places *Bruen* identified were historically deemed sensitive requires analysis of what they have in common. First and most obviously, all three places were, and still are, critical forums where the core decisional processes of our republican institutions take place. They represented the three pillars of American self-government: the election of representatives to make laws, the making of laws, and the enforcement of the rule of law. Each place creates the forum necessary to engage in considered and independent decision-making regarding matters of self-government. Independent decision-making cannot reliably occur if the decisionmakers are not secure from the possibility of violence. But no such concerns are present in the case of post offices, where no similar critical democratic decision-making occurs. As discussed previously, carrying a gun into a post office simply does not place self-government or the rule of law in jeopardy.

Second, each location during the Founding Era shared a key characteristic: they were enclosed, secured locations protected by government-provided comprehensive security. *See* David B. Kopel & Joseph G.S. Greenlee, The "Sensitive Places" Doctrine, 13 CHARLESTON L. REV. 204, 282 (2018) ("When armed guards are present, the government takes the responsibility for having armed force at the ready to protect citizens"). Additionally, as the district court in *Hardaway v. Nigrelli*, 636 F. Supp. 3d 329, 346 (W.D.N.Y. 2022) noted, these locations also were not places of frequent concourse by typical law-abiding citizens, and "uniform lack of firearms is generally a condition of entry." In other words, within the Founding Era tradition, comprehensive security *at a minimum* is required for a place to be deemed sensitive.

Founding Era examples of comprehensive security in these locations abound. Start with laws pertaining to legislatures. Rhode Island, Delaware, Pennsylvania, South Carolina, New York, Georgia, New Jersey, Virginia, and Vermont all enacted statutes compensating law enforcement to attend and provide security at their legislatures. *See* THE PUBLIC LAWS OF RHODE ISLAND 220, 222 (1798) (providing fees for sheriffs, town sergeants, and constables to attend the general assembly); LAWS OF DELAWARE vol 2., pp. 1100, 1118 (1797) (similar); PENNSYLVANIA STATUTES AT LARGE, Volume X: 1779-81, 378 (Stanley Ray ed., 1904) (referencing sergeant-at-arms and door-keeper for legislature); PUBLIC LAWS OF SOUTH CAROLINA 426, 427 (1790) (providing for payment of door-keepers for the legislature); 1 LAWS OF NEW YORK 532 (2d ed. 1807) (similar); A COMPILATION OF THE LAWS OF GEORGIA 373–73 (1812) (similar); JOURNAL OF THE VOTES AND PROCEEDINGS OF THE PROVINCIAL CONGRESS OF NEW JERSEY 239, 240 (1835) (similar); JOURNAL OF THE HOUSE OF

DELEGATES OF THE COMMONWEALTH OF VIRGINIA 77 (1828) (similar); THE LAWS OF VERMONT 382, 387 (1808) (similar).[6]

Consider laws pertaining to courthouses next. South Carolina, Virginia, Delaware, New Jersey, New York, and Pennsylvania by statute required law enforcement officials to attend court. See THE PUBLIC LAWS OF SOUTH CAROLINA 271 (Grimke, ed. 1790) ("The Said sheriffs shall by themselves, or their lawful deputies respectively, attend all the courts hereby appointed, or directed to be held, within their respective districts"); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA 69–71 (1803) (similar); LAWS OF DELAWARE vol. 2 1088, 1091 (1797) (similar); LAWS OF NEW JERSEY 49, 50, 58 (Joseph Bloomfield 1811) (similar); 1 LAWS OF NEW YORK 176 (2nd ed., Albany: Websters & Skinner 1807) (requiring during court "all justices of the peace, coroners, bailiffs, and constables within their respective counties, that they be then and there in their own persons. . . . And the said respective sheriffs and their officers shall then and there attend in their own proper persons."); THE STATUTES AT LARGE OF PENNSYLVANIA vol. X p. 57 (1904) (similar). Beyond these statutory requirements, the legislative record in other states indicates that law enforcement officials were compensated for attending judicial proceedings. See ACTS AND LAWS OF THE STATE OF CONNECTICUT 63–65 (1784); A DIGEST OF THE LAWS OF GEORGIA 471, 473–74, 478 (1800); THE LAWS OF MARYLAND (1799) (1799 law); ACTS AND RESOLVES OF MASSACHUSETTS 235 (1893) (1786 law); LAWS OF NEW HAMPSHIRE 112–16 (1797); A MANUAL OF THE LAWS OF NORTH CAROLINA 190–91, 196 (3d ed. 1814);

---

[6] The Plaintiffs have attached copies of these sources as **Attachment A** to their memorandum of law for the Court's and their opposing colleagues' convenience.

THE PUBLIC LAWS OF THE STATE OF RHODE ISLAND 220, 220 (1798); LAWS OF VERMONT 382, 287 (1808) (1798 law). [7]

Finally, examine laws pertaining to polling places. Georgia, Virginia, New Jersey, Maryland, Delaware, and South Carolina all enacted laws to provide security at polling places. See A DIGEST OF THE LAWS OF GEORGIA, 1800 Ga. Laws 611 (Watkins ed., 1800) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); ABRIDGEMENT OF THE PUBLIC PERMANENT LAWS OF VIRGINIA 325 (1796) (similar); MD. CONST. art. 1 §§ 3, 14 (1776) (similar); 1 LAWS OF NEW JERSEY 36 (Bloomfield ed., 1811) (providing security at polling places); 2 LAWS OF DELAWARE 984 (Samuel & John Adams, eds., 1797) (similar); THE PUBLIC LAWS OF THE STATE OF SOUTH CAROLINA 386–88 (1790) (table of fees includes payment to sheriffs for polling-place-related duties). [8]

These laws demonstrate the two critical pre-requisites for a place to be "sensitive" in the Founding Era and subject to a categorical ban on weapons: (1) they each were places where deliberative self-government occurred, and (2) governments provided comprehensive security at the place in question. This tradition is neither broader nor narrower, and the Court should conclude that it does not support 18 U.S.C. § 930(a)'s categorical prohibition on the possession of firearms in post offices.

---

[7] The Plaintiffs have attached copies of these sources as **Attachment A** to their memorandum of law for the Court's and their opposing colleagues' convenience.

[8] The Plaintiffs have attached copies of these sources as **Attachment A** to their memorandum of law for the Court's and their opposing colleagues' convenience.

**IV.    Even under the Second Circuit's more expansive definition of "sensitive places" post-*Bruen*, post offices do not fall within any of the rationales that it established.**

The Second Circuit has not had many opportunities to consider the scope of the "sensitive places" exception post-*Bruen*. The only Second Circuit decision that the undersigned could locate pertaining to "sensitive places" post-*Bruen* is *Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *judgment vacated in Antonyuk v. James*, 144 S.Ct. 1889 (2024) (remanding for further consideration in light of *United States v. Rahimi*, 144 S.Ct. 1889 (2024)).[9] *Antonyuk*, however, carries little weight in this case because the Second Circuit engaged in detailed historical inquiries as to the locations at issue. To the extent that Second Circuit developed broader rationales for its holdings, those rationales are inapplicable to this case.

*Antonyuk* considered a Second Amendment challenge to New York prohibitions on carrying firearms in six broad categories of locations: medical treatment centers, places

---

[9] The petition for certiorari in *Antonyuk v. James* presented two questions:

1. Whether the proper historical time period for ascertaining the Second Amendment's original meaning is 1791, rather than 1868; and
2. Whether "the people" must convince government officials of their "good moral character" before exercising their Second Amendment right to bear arms in public.

Pet. for Cert., at i, https://www.supremecourt.gov/DocketPDF/23/23-910/300925/20240220133931409_Antonyuk%20Petition%20for%20Cert%20final.pdf. As noted, the U.S. Supreme Court vacated the judgment and remanded for reconsideration in light of *Rahimi*.

The petition for certiorari challenged the Second Circuit's reliance on Reconstruction-era analogues in its sensitive-places analysis and its application of *Bruen* more generally. *See* Pet. for Cert., at 10-31. Thus, to the extent *Rahimi* provides guidance for courts attempting to apply *Bruen*'s analytical framework, the undersigned anticipate the Second Circuit is presently in the process of revisiting *Antonyuk*'s treatment of sensitive places. Supplemental briefing in may be appropriate if the Court renders a new decision in *Antonyuk* before deciding Nastri's case.

of worship, parks and zoos, premises licensed for alcohol consumption, places of entertainment (theaters, conference centers, and banquet halls), and First Amendment gatherings. For each category on which it considered the Second Amendment arguments,[10] the Second Circuit made nuanced historical inquiries to justify its ruling.

Start with medical treatment centers. New York prohibited the possession of a firearm in any medical treatment center. *Antonyuk*, 89 F.4th at 336. The Second Circuit concluded that there was a historical tradition of prohibiting the carrying of firearms around vulnerable populations such as those who have mental illness or schools where children regularly congregate to justify New York's prohibition on the carrying of firearms in medical treatment centers. [11] *Id*. at 339-41.

For public parks, the Second Circuit conducted a detailed historical inquiry into the development of public parks in the United States and concluded that late antebellum and Reconstruction history supported a conclusion that prohibitions on carrying firearms in urban parks were constitutional.[12] *Id*. at 356-63. Since its inquiry was heavily focused on the historical development of parks in America, the Second Circuit did not articulate any broader theme applicable to this case.

---

[10] For places of worship, the Second Circuit did not reach the Second Amendment argument because it affirmed the district court's issuance of a preliminary injunction on Free Exercise Clause grounds. *Antonyuk*, 89 F.4th at 346.

[11] The Plaintiffs do not concede that there is a historical tradition of categorically barring law-abiding citizens from carrying firearms in any place generally open to the public simply because vulnerable populations are present. While there might be a uniquely modern societal problem in the form of certain medical equipment triggering an accidental discharge of a firearm, any broader principles discovered by the Second Circuit are simply not applicable in this case.

[12] The Plaintiffs do not concede that there is a historical tradition of prohibiting the carry of firearms in urban parks. Any such broader principles discovered by the Second Circuit on this issue are simply not applicable in this case.

When the Second Circuit reached the question of zoos, it adopted much of its reasoning from its discussion of public parks. In addition, the Second Circuit examined Reconstruction-era and late-Nineteenth century regulations of firearms in ballrooms, social gatherings, and places which provide educational opportunities. The Second Circuit concluded there is a history and tradition "of regulating firearms in places of educational and scientific opportunity, places heavily trafficked by children, and places that are densely crowded," which probably supported New York's ban on firearms in zoos. *Id.* at 364.

Turning to premises licensed for alcohol consumption, the Second Circuit again conducted a historical inquiry into Reconstruction-era laws. The Second Circuit concluded there is a history and tradition of prohibiting intoxicated persons from carrying or purchasing firearms which probably supported this aspect of the New York ban. *Id.* at 367. The Second Circuit also concluded the ban was consistent with a tradition of prohibiting firearms in crowded social places. *Id.* at 368-69.

Finally, the Second Circuit considered theaters.[13] It incorporated its analysis that there is a history and tradition of prohibiting firearms in crowded places. *Id.* at 374-76.

None of the themes the Court identified in *Antonyuk* apply to post offices. Intoxicated persons, the seriously mentally ill, and children[14] are not frequent flyers at

---

[13] The Court did not engage in a *Bruen* analysis of conference centers and banquet halls, because it concluded "no plaintiff presented a justiciable challenge to the conference center and banquet hall provisions," so that "the district court's injunction was entered without subject-matter jurisdiction." *Id.* at 369.

[14] The Plaintiffs do not concede that there is a historical tradition of categorically barring law-abiding citizens from carrying firearms in any place generally open to the public simply because intoxicated individuals, the seriously mentally ill, or children are present. Any such broader principles discovered by the Second Circuit are simply not applicable in this case.

post offices. Unquestionably, the core retail customer base of the United States postal service is a broad and representative spectrum of the adult population of the United States. Post offices are not places for social gatherings or educational opportunities, nor are they exceptionally crowded.[15] According to statistics available from the U.S. Postal Service's own website, in 2023, there 665.3 million customer visits to just over 30,000 post offices in the United States. USPS, Postal Facts, https://facts.usps.com/size-and-scope/#:~:text=There%20are%2031%2C123%20Postal%20Service,offices%2C%20there%20are%2033%2C904%20offices.&text=The%20Postal%20Service%20had%20665.3%20million%20customer%20visits%20in%202023 (last visited Oct. 15, 2024). Excluding Sundays and federal holidays, a post office would typically be open about 300 days per year—meaning an average post office served only about 70 customers a day in 2023.

Consequently, *Antonyuk* does not provide support for banning firearms in post offices. Nor does it provide any support for concluding that post offices are sensitive places.

## V.    A permanent, nationwide injunction is appropriate.

A permanent, nationwide injunction is appropriate to restrain the defendants from seeking to enforce 18 U.S.C. § 930(g) against Plaintiff Nastri and the members of We The Patriots U.S.A., Inc.

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an

---

[15] The Plaintiffs also do not concede that there is a historical tradition permitting the government to ban firearms at social gatherings, educational gatherings, or exceptionally crowded places. In fact, *Bruen* expressly stated that New York could not declare a place "sensitive" simply because it was crowded. 142 S.Ct. at 2134.

irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "The party requesting permanent injunctive relief must demonstrate (1) irreparable harm (here, a constitutional violation) and (2) actual success on the merits." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).

Irreparable harm exists when there is no adequate remedy at law, such as money damages. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) Courts, however, also find that a movant has established irreparable harm when the movant's claim involves the alleged deprivation of a constitutional right. *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

The Plaintiffs have shown irreparable harm. First, a violation of a constitutional right always satisfies the irreparable harm factor. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). As discussed at length above, 18 U.S.C. § 930(g) violates their Second Amendment rights by prohibiting them from carrying firearms for self-defense in Post Offices.

Second, no other adequate remedy exists at law. As long as 18 U.S.C. § 930(g) remain un-enjoined, the Plaintiffs are subject to criminal prosecution at the whim of any federal official who seeks to press charges. Federal prosecutors enjoy absolute prosecutorial immunity against suits for damages. *See, e.g.*, *Van de Kamp v. Goldstein*, 555 U.S. 335, 340-342 (2009). *Egbert v. Boule*, 596 U.S. 482 (2022) drove a stake through the heart of any future *Bivens* claims against federal officials, and federal law presents an impenetrable bar to any other form of monetary relief against federal officials or the United States itself. Even if monetary relief existed, it is usually impossible to adequately compensate a constitutional injury monetarily. *Jolly*, 76 F.3d at 482.

Third, the Plaintiffs have shown actual irreparable harm. Every day that passes where 18 U.S.C. § 930(g) and the threat of its enforcement prohibit the Plaintiffs from carrying firearms for the purpose of self-defense in United States Post Offices is an injury that money cannot remedy. The days on which they have lost the right to exercise their Second Amendment rights are gone forever.

Turning to the remaining factors, the public interest and the balance of hardships factors "merge when the Government is the opposing party." *Haller v. U.S. Dep't of Health & Hum. Servs.*, 621 F. Supp. 3d 343, 361 n.12 (E.D.N.Y. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). These two elements always favor the plaintiff who establishes a constitutional violation. *See J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 743 (D. Conn. 2018) ("As with irreparable injury, when a plaintiff establishes a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction") (cleaned up). Because the Plaintiffs have demonstrated a violation of their

Second Amendment rights, they have demonstrated that both the public interest and the balance of the equities favor the issuance of permanent, nationwide injunction.

As to the scope of the remedy that the Plaintiffs seek, a "district court has a wide range of discretion in framing its decree to afford complete relief." *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 951 (2d Cir. 1978). And "it is well established that a court of equity having personal jurisdiction over a party has power to enjoin him from committing acts elsewhere." *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 213–14 (2d Cir. 2014) (cleaned up).

Thus, to afford the Plaintiffs complete relief, the Court should issue a permanent injunction prohibiting Defendants from taking any action to enforce 18 U.S.C. § 930(g) against Nastri and members of We The Patriots U.S.A., Inc. anywhere in the United States.

## CONCLUSION

The Plaintiffs have shown the absence of any material dispute of fact and their entitlement to summary judgment as a matter of law. They have shown that the Second Amendment's plain text protects their intended conduct. They have also shown that the Defendants cannot demonstrate a historical tradition sufficient to justify 18 U.S.C. § 930(g)'s prohibition on carrying firearms for self-defense in Post Offices.

Thus, they respectfully move the Court to grant their motion for summary judgment, declare unconstitutional 18 U.S.C. § 930(g)'s prohibition on carrying firearms for self-defense in Post Offices, and permanently enjoin the Defendants from enforcing 18 U.S.C. § 930(g)'s prohibition on carrying firearms for self-defense in Post Offices against David Nastri and the 18,523 members of We The Patriots USA, Inc.

The Plaintiffs,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing and its exhibits was served on all parties' counsel by electronic mail pursuant to the Court's September 3, 2024 order (Dkt. 14) in this case.

On the date that this document is electronically filed, notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ Cameron L. Atkinson /s/