## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID J. NASTRI, ESQ., *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>MERRICK GARLAND, in his official capacity, *et al.*,<br><br>                    Defendants. | Case No. 3:24-cv-222 |

## DEFENDANTS' COMBINED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendants Merrick Garland, in his official capacity as the Attorney General of the United States, and Louis DeJoy, in his official capacity as Postmaster General of the United States, hereby file this combined motion for summary judgment and opposition to Plaintiffs' motion for summary judgment.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

ARGUMENT ........................................................................................................... 3

I.    The Regulation of Firearms in Government Buildings is Presumptively
      Constitutional. ................................................................................................ 3

II.   Plaintiffs Have Not Carried Their Burden To Overcome That Presumption. ........... 5

      A. The Language From *Heller*, *McDonald*, and *Bruen* Cannot Be Dismissed as
         "Dicta." ...................................................................................................... 5

      B. Plaintiffs' Theory of "Sensitive Places" Is Flawed for Multiple Reasons. ............. 8

      C. Plaintiffs Ignore Other Important Constitutional Considerations. ..................... 10

      D. Plaintiffs' Theory Lacks Historical Support. ................................................. 12

         1.  Legislative assemblies. ......................................................................... 12

         2.  Courthouses. ........................................................................................ 15

         3.  Polling places. ..................................................................................... 17

III.  EVEN IF DEFENDANTS BORE THE BURDEN UNDER *BRUEN*, THE CHALLENGED STATUTE
      WOULD PASS MUSTER. ................................................................................. 20

      A. There Is a Long and Well-Established National History and Tradition of
         Safekeeping Places Where Government Business Was Conducted. ................... 21

      B. The Second Circuit's Decision in *Antonyuk* Is Controlling and Clarifying. ........ 22

      C. Plaintiffs' Historical Arguments Are Based on the Misunderstanding of *Bruen*
         that *Rahimi* Was Meant to Correct, as Recognized in *Antonyuk*. ...................... 25

IV.   IF THE COURT FINDS A CONSTITUTIONAL VIOLATION, IT SHOULD ORDER
      SUPPLEMENTAL BRIEFING ON THE APPROPRIATE REMEDY. ............................ 28

CONCLUSION ...................................................................................................... 29

## INTRODUCTION

Notwithstanding the individual right to keep and bear arms under the Second Amendment, the Supreme Court has repeated, time and again, that the government may regulate firearms in "sensitive places," which include "government buildings." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008)); *McDonald v. Chicago*, 561 U.S. 742, 786 (2010). Despite this clear guidance, Plaintiffs urge an incoherent and ahistorical theory of the Second Amendment: that "sensitive places" are only those where the government provided heightened, armed, and comprehensive security at the Founding. Accordingly, Plaintiffs argue that a 1988 federal statute that prohibits firearms in federal facilities is unconstitutional as applied to post offices. Plaintiffs fail to provide any historical evidence to support their interpretation of the precedents above. Nor do Plaintiffs grapple meaningfully with the fact that, when regulating its own property, the government draws upon the Property Clause and (in this case) the Post Office Clause of the Constitution, both of which enable the federal government to regulate postal property in ways that it could not regulate State or private property. *See United States v. Gliatta*, 580 F.2d 156, 160 (5th Cir. 1978). Finally, even if the "sensitive places" presumption did not apply, the government demonstrates below that the challenged prohibitions are consistent with the principles of Founding Era firearms regulation. Plaintiffs' insistence on a "dead ringer" or "historical twin" is the exact misinterpretation of *Bruen* that the Supreme Court corrected in *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

Neither the Supreme Court nor the Second Circuit has ever invalidated a regulation of firearms on federal property. Especially given Plaintiffs' failure to muster any historical evidence to support their theory, this case is a poor vehicle to break new ground.

## BACKGROUND

On November 18, 1988, Congress passed the Anti-Drug Abuse Act of 1988. *See* Pub. L. No. 100-690, 102 Stat. 4181. Section 6215 of that Act prohibited firearms in federal facilities, in pertinent part, as follows:

> (a) Except as provided in subsection (c), whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility, or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both.
>
> . . .
>
> (e) As used in this section:
>
>> (1) The term 'Federal facility' means a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties.
>
> . . .
>
> (h) Notice of the provisions of subsections (a) and (b) shall be posted conspicuously at each public entrance to each Federal facility . . . and no person shall be convicted of an offense under subsection (a) or (e) with respect to a Federal facility if such notice is not so posted at such facility, unless such person had actual notice of subsection (a) or (e), as the case may be.

*Id.* § 6215, 102 Stat. at 4361 (codified as amended at 18 U.S.C. § 930).

Sections 930(e)(1) and 930(h) are important qualifications. Plaintiffs suggest that the government "[i]nterpret[s] *Heller* and *Bruen*'s dicta to include all government buildings." Mem. of L. in Supp. of Pls.' Mot. for Summ. J. 16 ("Pls. Mem"). But that is a red herring in this case, where the challenged restriction only applies to buildings where federal employees regularly work. 18 U.S.C. § 930(e)(1). Plaintiffs also suggest that the U.S. Postal Service "do[es] not regularly display in Post Offices the signage announcing the prohibition on carrying firearms within." Pls. Mem. 17. But as the statute makes clear, "no person shall be convicted of an offense" under its provisions *unless* such notice is posted (or the defendant had actual knowledge of the prohibition).

Thus, the government cannot lure the unwary into violating this statute.

To Defendants' knowledge, in the 26 years that the statute has been in effect, it had never been challenged on Second Amendment grounds until last year. *See United States v. Ayala*, 711 F. Supp. 3d 1333 (M.D. Fla. Jan. 12, 2024).[1] Nevertheless, at least twice, a related regulatory ban on carrying firearms in Post Offices (39 C.F.R. § 232.1(l)) has been challenged as violative of the Second Amendment. Both of those challenges were rejected. *See Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015); *United States v. Dorosan*, 350 Fed. App'x 874 (5th Cir. 2009).

## ARGUMENT

### I.    THE REGULATION OF FIREARMS IN GOVERNMENT BUILDINGS IS PRESUMPTIVELY CONSTITUTIONAL.

There is no question that *Bruen* changed the mode of analysis for Second Amendment claims. But *Bruen* did not disturb the Supreme Court's prior and repeated assurances, starting with *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the constitutionality of regulating firearms in government buildings is settled.

*Heller* began by observing that, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626. With that principle in mind, *Heller* explained that its decision to strike down a local ordinance that had prohibited the keeping of handguns in homes "should [not] be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id*. The Court identified such sensitive-place restrictions as but one example in a non-exhaustive list of "presumptively lawful regulatory measures" that do not clash with the Second

---

[1] Defendants are aware of other (failed) challenges to separate parts of 18 U.S.C. § 930. *See United States v. Bundy*, No. 3:16-cr-00051-BR, 2016 WL 3156309, at *4 & n.3 (D. Or. June 3, 2016) (upholding § 930(b)); *United States v. Giraitis*, 127 F. Supp. 3d 1, 3 (D.R.I. 2015) (upholding § 930(e)(1)).

Amendment. *Id.* at 627 n.26. The Court also singled out "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. In making those assurances, the *Heller* Court explained that it would "expound upon the historical justifications for the exceptions [it had] mentioned if and when those exceptions come before [it]." *Id.* at 635. Then, in *McDonald v. City of Chicago*, the Supreme Court "repeat[ed] those assurances," reiterating that it had "made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as . . . 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings,' [etc.]." 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626–27). Finally, in *Bruen*, the Court reaffirmed those exceptions yet again, *see* 597 U.S. at 30–31, even as it invalidated New York's proper-cause licensing regime.

Plaintiffs suggest that "*Bruen* adopted a far narrower interpretation [than *Heller*] of what constitutes a well-settled 'sensitive place.'" Pls. Mem. 16. To the contrary, *Bruen* quoted the term "government buildings" from *Heller* without modification or caveat. 597 U.S. at 30. The majority later explained that its holding was "consistent with *Heller* and *McDonald*," *id.* at 10, and "[i]n keeping with *Heller*," *id.* at 17. Indeed, two of the concurring opinions in *Bruen*—votes that would have been necessary to garner a majority—emphasized that *Bruen* does not "disturb[] anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns[,]" *id.* at 72 (Alito, J., concurring), and (more specifically) that *Bruen* casts no "doubt on longstanding prohibitions on the . . . carrying of firearms in sensitive places such as schools and government buildings,", *id.* at 81 (Kavanaugh, J., concurring, in which Roberts, C.J., joined).[2]

---

[2] Plaintiffs' reading would also create a contradiction within *Bruen*. The majority opinion offers "legislative assemblies, polling places, and courthouses" as examples of "sensitive places such as schools and government buildings." 597 U.S. at 30. But the former cannot be a definitive list of

At least six circuits, including the Second Circuit, seem to agree. *See Antonyuk v. James*, 120 F.4th 941, 961 (2d Cir. 2024); *see also Rocky Mountain Gun Owners v. Polis*, 121 F.4th. 96, 119 (10th Cir. 2024); *United States v. Gailes*, 118 F.4th 822, 824–25 (6th Cir. 2024); *Wolford v. Lopez*, 116 F.4th 959, 970 (9th Cir. 2024); *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024); *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023).[3] All of those opinions, issued after *Bruen*, still understood "government buildings" writ large to be "sensitive places" where firearms regulations were presumptively constitutional. Defendants are not aware of any federal appellate decision—and Plaintiffs do not cite any—that understood *Bruen* to "narrow[]" (Pls. Mem. 16) *Heller* and *McDonald* to a subset of government buildings.

## II.    PLAINTIFFS HAVE NOT CARRIED THEIR BURDEN TO OVERCOME THAT PRESUMPTION.

### A.    The Language From *Heller*, *McDonald*, and *Bruen* Cannot Be Dismissed as "Dicta."

The Supreme Court has said several times that the Second Amendment does not undermine firearm prohibitions in government buildings. *See Bruen*, 597 U.S. at 30; *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786. Nevertheless, Plaintiffs argue that the "government buildings" language from *Heller* and *McDonald* is "dicta" (Pls. Mem. 15) and should not, therefore, control. That is wrong.

"Virtually every one of the [Supreme] Court's opinions announcing a new application of a constitutional principle contains some explanatory language that is intended to provide guidance to lawyers and judges in future cases." *Carey v. Musladin*, 549 U.S. 70, 79 (2006) (Stevens, J., concurring). "By their very nature, doctrinal frameworks sweep far beyond the facts at hand to

---

the latter, as the former contains no examples of "schools." *Id.* Thus, even putting aside the "*e.g.*" that precedes "legislative assemblies, polling places, and courthouses," that list cannot have been meant to narrow "government buildings" to a subset.

[3] The Fifth Circuit's decision in *Rahimi* was, of course, reversed. *See* 602 U.S. 680. But the salient point is that the panel decision in *Rahimi* did not blink at the words "government buildings" or read *Bruen* to "narrow[]" (Pls. Mem. 16) that term.

address other situations not concurrently before the court." Randy J. Kozel, *The Scope of Precedent*, 113 Mich. L. Rev. 179, 193 (2014). Given the relatively small number of cases the Supreme Court decides, applying conventional "what is a holding" principles to those decisions would hamstring the Court, trivialize its most important pronouncements, and beget circuit conflicts. "It is quite wrong to invite [lower-court] judges to discount the importance of such guidance on the ground that it may not have been strictly necessary as an explanation of the Court's specific holding in the case." *Musladin*, 549 U.S. at 79 (Stevens, J., concurring). Though part of a Supreme Court opinion may technically be dicta, "it does not at all follow that we can cavalierly disregard' those statements." *Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 100 (2d Cir. 2023) (quoting *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975)). Rather, lower courts "nonetheless accord deference to such dicta where, as here, no change has occurred in the legal landscape." *Id.* (citing *Bell*, 524 F.2d at 206 (noting that Supreme Court dicta "must be given considerable weight")); *see also Clemente v. Lee*, 72 F.4th 466, 474 (2d Cir. 2023) ("[W]e have an obligation to accord great deference to Supreme Court *dicta*" (quoting *Newdow v. Peterson*, 753 F.3d 105, 108 n.3 (2d Cir. 2014)).

As relevant here, *Heller* identified classes of presumptively lawful regulations—including "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"—as part of its historical analysis of the Second Amendment's meaning. 554 U.S. at 626. To be sure, *Heller* said that the Court would expound on the historical justifications for those permissible regulations when a case raising them comes before it, but the Court expressed no doubt that those regulations would likely be permissible, and it described these classes as "*presumptively lawful* regulatory measures," *id.* at 635 n.26 (emphasis added). Thus, this Court need not start from scratch. *Cf. Bonidy*, 790 F.3d at 1136 (Tymkovich, J., concurring in part and dissenting in part) (dissenting on the grounds that the sensitive-places language is dicta but noting that, even if it is

dicta, *Heller* "placed a thumb on the scale" in favor of government buildings being sensitive places). Rather, as the Eighth Circuit concluded, it is "more likely that the Court presumed that the regulations are constitutional because they are constitutional, but termed the conclusion presumptive because the specific regulations were not at issue in *Heller*." *United States v. Jackson*, 69 F.4th 495, 505 n.3 (8th Cir. 2023).

Any question whether *Bruen* narrowed *Heller* is academic after the Second Circuit's decision in *Antonyuk*.[4] In the course of a thorough exposition of Supreme Court precedent, 120 F.4th at 960–74, the Second Circuit accepted that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" were "presumptively lawful." *Id.* at 961, 962 (quoting *Heller*, 554 U.S. at 626–27 & n.26). And the court did not hesitate to rely on *Bruen*'s "dicta" as binding. *E.g.*, *id.* at 1026 ("We rely on *Bruen* for the proposition that the tradition of regulating firearms in spaces frequented by children is also well-established and representative." (citing *Bruen*, 597 U.S. at 30)). There is no reason to think that the Second Circuit would have treated *Bruen*'s "government buildings" language any differently than the district court did: "To the extent this finding of lack of standing is in error, the Court would have concluded that the Supreme Court has already recognized the permissibility of this regulation." *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 261 n.12 (N.D.N.Y. 2022) (citing *Bruen*, 597 U.S. at 30; *Heller*, 554 U.S. at 626).[5]

Because post offices are at least presumptively (if not definitively) sensitive places, Plaintiffs bear the burden of proving otherwise. *Cf. United States v. Class*, 930 F.3d 460, 465 (D.C.

---

[4] The Second Circuit's amended opinion after remand, *Antonyuk*, 120 F.4th 941, was issued just six days before Plaintiffs moved for summary judgment. Defendants assume that is why Plaintiffs did not cite or discuss that opinion.

[5] New York's government-property prohibitions were not presented on appeal in *Antonyuk* because the plaintiffs did not appeal from the district court's holding that they lacked standing to challenge those prohibitions. *Antonyuk*, 120 F.4th at 959 n.7.

Cir. 2019) (observing that post offices, as government buildings, are "the paradigmatic 'sensitive places' identified in" *Heller*), *abrogated on other grounds, Bruen*, 597 U.S. at 19 n.4 (collecting *Class* and other cases that had applied means/ends scrutiny). To overcome that presumption in this case, Plaintiffs must show (at a minimum) that post offices are sufficiently dissimilar from legislative assemblies, polling places, courthouses, and schools, which *Bruen* expressly (but not exhaustively) identified as examples of "sensitive places" where firearms may be prohibited. Plaintiffs fail that test.

**B.    Plaintiffs' Theory of "Sensitive Places" Is Flawed for Multiple Reasons.**

Plaintiffs posit that the only "sensitive places" where Congress can prohibit firearms are "critical forums where the core decisional processes of our republican institutions take place" that are " enclosed, secured locations protected by government-provided comprehensive security." Pls. Mem. 18, 19. That theory, cut from whole cloth with no precedential support, would drastically curtail *Heller*, *McDonald*, and *Bruen*—none of which used any caveat when reiterating that "government buildings" were "sensitive places." Plaintiffs are obviously trying to distill a definition of "sensitive places" that includes the examples in *Bruen* (legislative assemblies, polling places, and courthouses) but excludes post offices. But the resulting theory suffers multiple defects.

First, Plaintiffs' test fails on its own terms. As demonstrated below, Plaintiffs have not shown that legislative assemblies, polling places, or courthouses were provided comprehensive security at the Founding. But the Court need not pore over 18th century statutes to arrive at that conclusion. "Polling places" are perhaps the starkest example. Even assuming that filling out a secret ballot is "deliberative self-government occur[ring]" (Pls. Mem. 21), millions of Americans vote in high school gymnasiums, churches, municipal offices, recreation centers, and other places that would never qualify as "secured locations protected by government-provided security."

Indeed, most Americans likely cast their vote without ever encountering an armed guard.

That illustrates the illogic behind Plaintiffs' theory. They seem to posit that, if the government provides armed security someplace, that makes it "sensitive" such that the government can then prohibit firearms carriage. And a critical aspect of such security is that it includes "screening for weapons." *Id.* at 2; *accord id.* at 17. In other words, "comprehensive" security means disarming visitors. As Plaintiffs' theory goes, "[w]hen armed guards are present, the government takes the responsibility for having an armed force at the ready to protect citizens." *Id.* at 19 (quoting Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 204, 282 (2018)). But that amounts to an argument that the government can only bar firearms through legislation once it has already barred firearms through force. That makes little sense. Why would the Second Amendment only allow those firearms regulations that are unlikely to have any practical effect? And why would the Constitution tolerate keeping firearms out of post offices by patting down visitors, but not by passing a law?

Plaintiffs' theory is also contradictory. They posit that polling places, legislative assemblies, and courthouses are all "sensitive places"—and thus, the government can prohibit firearms there—because "[i]ndependent decision-making cannot reliably occur if the decisionmakers are not secure from the possibility of violence." *Id.* at 18. In other words, Plaintiffs concede that the presence of guns raises the possibility of violence against government officials. But elsewhere in their brief, Plaintiffs suggest that the Founders' answer to safety concerns was to "compel[] the possession and bearing of firearms." *Id.* at 11 (citing *Ayala*, 711 F. Supp. 3d at 1341). On that (flawed) theory, Founding Era legislatures should have been requiring *more* firearms at legislative assemblies, polling places, and courthouses—not prohibiting them.

Plaintiffs' theory is also incomplete. Legislative assemblies, polling places, and courthouses are not the only examples of "sensitive places" that the Supreme Court has identified.

Plaintiffs never address "schools." *Bruen*, 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626). And Plaintiffs' novel theory of "sensitive places" cannot possibly cover schools, which are not places of deliberative self-government and certainly have not historically been provided comprehensive government security. Because Plaintiffs' proffered definition does not cover one of the "sensitive places" that the Supreme Court has expressly (and repeatedly) recognized, Plaintiffs' definition cannot be correct.

Finally, it is worth noting the potential reach of Plaintiffs' theory if accepted. There exist all manner of government buildings where "core decisional processes of our republican institutions" do not take place, and which have not historically enjoyed "government-provided comprehensive security." Pls. Mem. 18, 19. On Plaintiffs' (mis)understanding of "sensitive places," Congress could not prohibit firearms in regional Social Security offices, in Veterans' Affairs hospitals, or in NASA's Jet Propulsion Laboratory. Indeed, it may be that only a minority of modern government buildings would pass Plaintiffs' test. But that would contradict the Supreme Court's repeated and unqualified admonition that "government buildings" are "sensitive places."

### C.     Plaintiffs Ignore Other Important Constitutional Considerations.

The constitutional dimensions are different here than in the Supreme Court's recent firearms cases. *Heller* concerned the possession of handguns in the home. 554 U.S. at 628. *McDonald* concerned the prohibition on handguns within city limits. 561 U.S. at 751. *Bruen* concerned "good cause" and "proper cause" requirements to possess handguns inside the home and within city limits, respectively. 597 U.S. at 12. And *Rahimi* considered a statutory ban on firearm possession by one subject to a domestic-violence restraining order. 602 U.S. 680. In every case, the question was whether (or to what extent) the government could regulate firearms outside its property.[6]

---

[6] *Antonyuk* considered "sensitive locations," but as noted above, Plaintiffs did not appeal with respect to government-owned or-leased property.

The critical differences here are that the government owns (or leases) the property at issue and that "federal employees are regularly present for the purpose of performing their official duties." *See* 18 U.S.C. § 930(g)(1). The Constitution grants Congress the "[p]ower to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States[.]" U.S. Const. art. IV, § 3, cl. 2. "The power over the public land thus entrusted to Congress is without limitations." *United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 29 (1940). "Beyond doubt, the Property Clause authorizes the enactment and enforcement of regulations which, like those at issue in this case, are designed to maintain safety and order on government property." *Gliatta*, 580 F.2d at 160. In this case, Congress can also rely on the Post Office clause. *See id.* ("Th[e Post Office] clause has been construed expansively to encompass all sorts of measures relating to the safe and efficient transmission of the mail[.]"(citing U.S. Const. art. I, § 8, cl. 7 and collecting cases)); *Ex parte Jackson*, 96 U.S. 727, 728 (1877) (Congress' power "'to establish post-offices and post-roads' has been practically construed, since the foundation of the government, to authorize not merely the designation of the routes over which the mail shall be carried, and the offices where letters and other documents shall be received to be distributed or forwarded, but the carriage of the mail, and all measures necessary to secure its safe and speedy transit, and the prompt delivery of its contents."). And when those two clauses act together: "As a government-owned business acting as a proprietor rather than as a sovereign, the USPS has broad discretion to govern its business operations according to the rules it deems appropriate." *Bonidy*, 790 F.3d at 1126; *cf. U.S. Postal Serv. v. Flamingo Indus.*, 540 U.S. 736, 739 (2004) (acknowledging the Postal Service to be "the nation's oldest and largest public business" (citation omitted)). "In light of that discretion, the contrast between the regulation challenged here and the bans struck down in *Heller* and *McDonald* is stark." *Bonidy*, 790 F.3d at 1126.

Since the Founding, the Property Clause has conferred power upon the federal government

to regulate its own buildings. *Cf. Class*, 930 F.3d at 463–64 (holding, pre-*Bruen*, that prohibiting guns on grounds of the U.S. Capitol "does not impinge upon a right protected by the Second Amendment" (cleaned up), and affirming the prohibition partly because "as the owner of the Maryland Avenue lot [which was part of the Capitol grounds], the government—like private property owners—has the power to regulate conduct on its property"). Our Founders understood that property owners had the right to exclude others from their property and, along with it, the lesser power to restrict the actions or conduct of visitors as a condition of admittance. *See* William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 826–27 (1995) ("The individual's right of property 'consists in the free use, enjoyment, and disposal of all acquisitions, without any control of diminution, save only by the laws of the land.'" (quoting Blackstone's Commentaries)); *see also Nekrilov v. City of Jersey City*, 45 F.4th 662, 683–84 (3d Cir. 2022) (Bibas, J., concurring) (similarly describing the Founders' "broad conception" of property rights (also citing Blackstone's Commentaries)). Taken together with the settled historical examples that the Supreme Court identified—firearm prohibitions in legislative assemblies, polling places, and courthouses—the Property Clause demonstrates a historical understanding of the government's authority to restrict firearms in its own buildings, without exception, and a tradition of doing so.

### D.    Plaintiffs' Theory Lacks Historical Support.

Apart from the logical and legal shortcomings of Plaintiffs' theory of "sensitive places," it finds no historical support.

### 1.    Legislative assemblies.

With respect to legislatures, Plaintiffs' lengthy string cite (Pls. Mem. 19–20) is carefully described as a list of "statutes compensating law enforcement to attend and provide security for

legislatures." *Id.* at 19.[7] And indeed, seven of the nine examples in that string cite are merely fee schedules that compensate various types of officers for attending proceedings. *See* Attach. A, Mem. of L. in Supp. of Pls.' Mot. for Summ. J ("Pls. Att. A"), Ex. 1 (Rhode Island), Ex. 19 (Delaware), Ex. 8 (Pennsylvania), Ex. 5 (South Carolina), Ex. 9 (New York), Ex. 7 (Georgia), and Ex. 2 (New Jersey).[8] Taking the first example, the Rhode Island legislature merely authorized compensation of $1/day for any sheriff attending the General Assembly or court proceedings and $0.75/day for any town sergeant or constable doing the same. *See id.* at 005, 006.[9] None of Plaintiffs' examples requires any sheriff, constable, etc. to be present for legislative assemblies. Let alone does any example describe "comprehensive security" being provided at such assemblies.

Other evidence merely reflects that a "sergeant at arms" or "door-keeper" would be compensated to attend legislative sessions. *See, e.g.*, *id.* at 039 (sergeant-at-arms in Pennsylvania); *id.* at 101 (door-keeper in Rhode Island). But because Plaintiffs' examples are merely fee schedules, they do not define the roles of a "sergeant at arms" or "door-keeper." Yet other Founding-era evidence, not cited by Plaintiffs, is illuminating. Consider, for example, the Votes and Proceedings of the Maryland House of Delegates from the November 1791 Session, attached as Defs. Ex. 2. That document does not address security of the legislative session. *Id.* It does not require the presence of guards (armed or not), the screening of visitors, or anything of the sort. *Id.* (That is despite meticulously prescribing *thirty-one* rules of procedure, governing everything from

---

[7] The description is misleading. None of the fee schedules says "provide security for" or any variant of that. They merely reimburse for attendance. And for reasons explained more fully below, there is little reason to think that the attendance of a sheriff or constable was exclusively, or even primarily, to perform a security function.

[8] Without a pin citation or direct quote, it is not clear what Plaintiffs rely on with respect to New York (Pls. Att. A, Ex. 9) or Virginia (Pls. Att. A, Ex. 3). If Plaintiffs specify what they rely on from the cited pages, Defendants will respond in their reply brief.

[9] For ease of the Court's and Parties' reference, Defendants attach a version of Plaintiffs' historical evidence (Attachment A to Plaintiffs' motion) with Bates numbers added. Pin citations in this brief will refer to those page numbers. *See* Defs. Ex. 1.

the wearing of hats to the order in which members would sit and stand. *Id.* at 2–3.)

But the document does reflect that "[t]he house appointed Mr. Cornelius Mills sergeant at arms, and Mr. Charles Hogg door-keeper." *Id.* at 2. Like Plaintiffs' examples, the document is silent on those individuals' roles. *See id.* But the Maryland State Archives shed some light: "During the October 1778 session, the House of Delegates first appointed Cornelius Mills as doorkeeper. *His tasks included supplying wood for the use of the General Assembly and maintaining the furniture*. In 1782, Mills was also paid separately for crafting a chair for the Speaker." *See* Archives of Maryland (Biographical Series): Cornelius Mills (c.1755–1823) (emphasis added) (footnotes omitted).[10] There is no mention of Mr. Mills' having any law-enforcement experience to speak of, which is not surprising given that "[d]uring this time, Mills also worked on the James Brice House in Annapolis as a carpenter/joiner, ran a boardinghouse, and advertised his experience as an auctioneer." *Id.* And yet, he was later appointed the sergeant-at-arms for the House of Delegates. *Id.*[11] There is nothing in Plaintiffs' evidence to suggest that the mere presence of a "door-keeper" or "sergeant at arms" was enough to supply "comprehensive government security," Pls. Mem. 2, and this evidence would seem to rebut that notion.

At bottom, none of the statutes cited by Plaintiffs refers to or requires "government-provided comprehensive security," which Plaintiffs argue is the hallmark of a "sensitive place." *Id.* at 19. And importantly, none of Plaintiffs' examples requires the officer(s) in attendance— when they do attend—to be *armed*. That undermines the thesis of Plaintiffs' Second Amendment argument: "When *armed* guards are present, the government takes the responsibility for having

---

[10] *Available at* https://msa.maryland.gov/megafile/msa/speccol/sc3500/sc3520/016700/016711/html/16711bio.html.

[11] On the Maryland Senate side, there is not even a mention of a "sergeant at arms." *Compare* Defs. Ex. 2 (Votes and Proceedings of the Maryland Senate for the November 1791 Session) ("William Tuck was appointed messenger, and Edward Roberts door-keeper. ORDERED That they be qualified.").

*armed* force at the ready to protect citizens." *Id.* at 14 (quoting Kopel & Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 204, 289–90 (2018) (emphasis added)). Plaintiffs have not proved that any Founding-Era government required "armed, or even unarmed, security guards" (Pls. Mem. 17) to protect Founding-Era legislative assemblies.

### 2.    Courthouses.

Defendants acknowledge that at least some Founding-Era governments—namely, South Carolina (Pls. Att. A at 020), Virginia (*id.* at 013), and Delaware (*id.* at 099)—required sheriffs to "attend" the "courts." But that does not establish that "courthouses" are only "sensitive places" (per *Bruen*, 597 U.S. at 30) because they were "secured locations protected by government-provided comprehensive security." Pls. Mem. 19.

None of the three examples elaborates on what it means for a sheriff to "attend" a court in the late 18th century. *See generally* Pls. Att. A at 013, 020, 099. There is no mention of screening visitors or of otherwise securing the property. *Id.* None of the three examples requires more than one sheriff (or sheriff's deputy) to attend the court, which cannot plausibly qualify as "comprehensive security" within Plaintiffs' meaning. *Id.* And at least one of the examples (Delaware) suggests that "attend[ing]" court had nothing to do with securing the courthouse. *See id.* at 099 ("the Sheriff of Kent county, for the time being, shall be attendant on the said High Court of Errors and Appeals during the sitting thereof, *and be the officer for the purpose of executing the . . . process of the said court* [.]" (emphasis added)).

Other examples, too, suggest that "attend" connoted ministerial and administrative duties. *See id.* at 042 (New York example[12]) (requiring sheriffs to bring grand and petit jurors to court, transport prisoners, facilitate witnesses, etc.). Plaintiffs quote this part of the New York Statute:

---

[12] Page 042 of Plaintiffs' Attachment A (page 176 of the *Laws of New York* compilation) is lacking the useful context of the preceding page, which Defendants attach as Exhibit 3.

"all justices of the peace, coroners, bailiffs, and constables within their respective counties [must] be then and there in their own persons . . . And the said respective sheriffs and their officers shall then and there attend in their own proper persons." Pls. Mem. 20. But that simply requires officers to attend and do their jobs. It does not explain *what* their job is, let alone that their job includes providing comprehensive security by, for example, disarming all visitors.

With respect to Pennsylvania, the only duty prescribed to sheriffs on the cited page (Pls. Att. A at 038) is to summon a grand jury. It does not even require that the sheriff "attend" the ensuing action. *Cf. id.* In any event, that reference is a minor dovetail on a provision governing appeals from orders issued by "regulators" appointed by municipal commissioners to review applications to "lay any foundation or party wall within [the] district" of Southwark. *See Statutes at Large of Pennsylvania*, Vol. X at 56 (1794).[13] This has nothing to do with securing courthouses.

That leaves Plaintiffs' New Jersey example. *See* Pls. Att. A at 092–94. Though they do not specify, Plaintiffs presumably refer to this passage: "That the constables of the several townships in such county shall be the ministerial officers of the said court[.]" *Id.* at 093. But the statute goes on to specify those constables' roles: "to execute and return all precepts, summons, warrants, writs and other process, issuing out of the said court, and to them or any of them directed and delivered, and to perform all matters, acts, and things appertaining to their offices aforesaid." *See Laws of New Jersey* 50–51 (1811).[14] There is no mention of courthouse security. One of the constables' duties was to "attend the jury," as explained at Pls. Att. A at 094: the constable would swear to "keep every person sworn (or affirmed) on this jury together in some private and convenient place, without meat or drink, water excepted," and not to "suffer any person to speak to them," "until

---

[13] Because it is important to understand the context of the entire statute—which has nothing to do with securing courts, but rather with incorporating the district of Southwark, a suburb of Philadelphia—Defendant attaches the entire statute for the Court's convenience. *See* Defs. Ex. 4.

[14] Once again, Defendant is attaching the full statute for context. *See* Defs. Ex. 5.

they have agreed on their verdict." In other words, New Jersey constables were charged with keeping jurors sober, sequestered, and safe while they deliberated. But that only highlights the absence of any parallel charge to keep *the courthouse* safe as a general matter.

In the entire 21-page New Jersey statute at issue, which was meant to "constitut[e] courts for the trial of small causes," there is no mention whatever of securing courthouses. There is one mention of local sheriffs, but only in the context of capturing escaped prisoners. *See Laws of New Jersey* 61 (1811). There are many mentions of constables, but—as noted above—their jobs were mostly ministerial and procedural. And none of those statutes specified that those persons must be *armed* while carrying out their duties or disarm others.

Finally, Plaintiffs suggest that "the legislative record in other states indicates that law enforcement officials were compensated for attending judicial proceedings." Pls. Mem. 20 (citing examples). But that suffers from the same problem as the legislative-assemblies argument: those fee schedules compensate for, but do not require, law-enforcement attendance. Plaintiffs' first example proves the point. *See* Pls. Att. A at 051–52. Connecticut sheriffs and constables were reimbursed one shilling and a six-pence for "[a]ttending a Justice's Court, on Trial of each Action *when obliged to attend*." *Id.* (emphasis added). Apparently, these officers were not even required to attend every day of a trial—let alone provide "comprehensive security" (Pls. Mem. 18) at every courthouse on a regular basis. And because these sheriffs and constables were charged with other duties—many of which, by definition, could only be performed outside the courthouse (and sometimes outside the district)—these statutes are good evidence that the sheriffs could not, in fact, have been playing the security role that Plaintiffs ascribe to them.

### 3. Polling places.

Plaintiffs also fail to prove their theory with respect to polling places. Plaintiffs rely on two examples where the State required sheriffs to attend for law-enforcement purposes. *See* Pls. Att.

A at 085 (Georgia) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); Md. Const. art. I § 14 (1776) ("[T]he Sheriff of each county, or in case of sickness, his Deputy (summoning two Justices of the county, who are required to attend, for the preservation of the peace), shall hold and be judge of the said election[.]"). But that only serves to contrast the 11 "legislative assemblies" examples offered by Plaintiffs (Pls. Mot. 15–16)—which, notably, included Georgia—none of which required any law-enforcement presence. In other words, Georgia seems to have required sheriffs to attend polling places but not legislative assemblies. In any event, neither Georgia nor Maryland required the attendant sheriffs to be armed—a prerequisite to any "sensitive place" under Plaintiffs' theory.

The two examples above also form a stark contrast with the other "polling places" examples. The Virginia statute, for example, underscores the disunity in Plaintiffs' record. *See* Pls. Att. A at 047. The "election" at issue in that statute was to fill vacancies in unincorporated towns' trustees or directors; the statute did not govern elections more generally. *Id.* In any event, upon such a vacancy, the remaining trustee(s)/director(s) was to notify the sheriff, who would then notify the "freeholders of the said town" and "requir[e] them to appear at a certain place" to elect a replacement. *Id.* It is no surprise, therefore, that the sheriff was required to "attend and take the poll at such election." *Id.* But that was so that he could "enter[] the names of the persons voted for in a distinct column" and then report the votes to the county court. *Id.* It was not—as in the Georgia example—to "preserv[e] good order." *See id.* at 085.

The 1811 New Jersey statute cited by Plaintiffs (Defs. Ex. 6[15]) is also inapposite. The cited portion provides that "for the preservation of good order, as well as for the security of the election

---

[15] It seems that Plaintiffs included the wrong document in their Attachment A (at 091). The cited page (36) does not refer to elections. Defendants' Exhibit 6 contains what they believe to be the correct page.

officers from insult and personal abuse, the said officers are hereby authorized and empowered to commit any person or persons who shall conduct in a riotous or disorderly manner, and persist in such conduct after being warned of the consequences, either into the custody of a constable, or the keeper or a common [jail]." *Id.* While mentioning "a constable," and empowering election officers to commit persistent malfeasants to those constables' custody, the statute conspicuously does *not* require any such constable to attend the election process, or that they be armed.

Furthermore, under Plaintiffs' logic, New Jersey would seem to have dealt with the threat to its elections "through materially different means" than staffing such places with armed government security. Pls. Mem. 7 (quoting *Bruen*, 597 U.S. at 26). Instead, and in contrast to the Georgia example, New Jersey seems merely to have upped the penalties for threatening elections—precisely what Plaintiffs say *does not* suffice with respect to post offices. *See id.* at 13 ("[T]he United States Postal Service has always been fraught with danger, and the enduring historical tradition has been to encourage the possession of weapons in conjunction with mail services. Prohibiting their possession is only of recent vintage, thus lacking the necessary historical foundation to survive a *Bruen* historical analysis.").

As regards Delaware and South Carolina, neither example carries Plaintiffs' burden. Delaware sheriffs were—along with "every other officer and person whose duty it was to attend, conduct, and regulate the General Election"—"required to attend, conduct, and regulate the election herein directed to be held for the purpose aforesaid, in like manner as in and by the said election laws." Pls. Att. A at 097. But that does not imply any law-enforcement purpose(s) in those sheriffs' attendance, unlike the Georgia and Maryland examples above. Nor do the "Tables of Fees" from South Carolina cited by Plaintiffs. *See* Pls. Att. at 021–23. They provide reimbursement for "publishing writs for electing members to the General Assembly, taking the ballots and returning the writ." Pls. Att. A at 023. Despite the reference to elections, there is no mention of

polling places (the relevant "sensitive places"). And the following fee table, applicable to constables, mentions "serving a warrant," "summoning a witness," and "serving an execution or attachment returnable to the County Court"—but no reimbursement for service at legislative assemblies or polling places. Neither example proves that Delaware or South Carolina was providing "comprehensive security" (Pls. Mem. 18) to its polling places.

## III. EVEN IF DEFENDANTS BORE THE BURDEN UNDER *BRUEN*, THE CHALLENGED STATUTE WOULD PASS MUSTER.

Although the Court need not address this point, as Plaintiffs have not rebutted the presumption that 18 U.S.C. § 930(a), as arms prohibitions applied to government buildings, is constitutional, *Atonyuk*, 120 F.4th at 962, Defendants would prevail even if they bore the burden of justifying the statute as consistent with our national history and tradition of firearms regulations.

The historical inquiry, *Bruen* explained, "will often involve reasoning by analogy," in which courts examine "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." 597 U.S. at 28–29. That "analogical reasoning" should be "neither a regulatory straightjacket nor a regulatory blank check." *Id*. at 30. A court should not uphold modern laws simply because they remotely resemble historical outliers. *Id*. But neither should a court search in vain for a "historical *twin*"; "a well-established and representative historical *analogue*" will suffice. *Id*. (emphases in original). Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*.

Despite this guidance, some lower courts misunderstood *Bruen* to require too close of an historical analogy to the modern regulation at issue. *See Rahimi*, 602 U.S. at 691. The Supreme Court reiterated that *Bruen*, *McDonald*, and *Heller* "were not meant to suggest a law trapped in amber." *Id.* Rather, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692 (citing

*Bruen*, 597 U.S. at 26–31). So a court "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (alteration in original) (quoting *Bruen*, 597 U.S. at 29 & n.7).

To that end, *Rahimi* held that our historical tradition of surety laws and going-armed laws, which could lead to jail for individuals who threatened the physical safety of others, suffices to justify a modern law that disarms subjects of domestic-violence restraining orders, even though historically there were no such specific restrictions. *Id.* at 697. In reversing the Fifth Circuit, the Court recognized the adequacy of an appropriately analogous, "relevantly similar" restriction, and it squarely rejected the notion that a match was required.

### A.  There Is a Long and Well-Established National History and Tradition of Safekeeping Places Where Government Business Was Conducted.[16]

Laws prohibiting the carrying of weapons in places of government business trace their roots to 14th century England. In 1313, a law was passed providing that, for those who appear in Parliament, "every Man shall come without all Force and Armour." 7 Edw. 2, 170 (1313). That law was followed in 1328 by the Statute of Northampton, which prohibited the carrying of arms "before the King's justices" and "other of the King's ministers doing their office." *Bruen*, 597 U.S. at 40 (citing 2 Edw. 3 c. 3 (1328)).

That general proposition remained in place for centuries and laid the groundwork for similar laws in the colonies. For example, in 1647, Maryland outlawed firearms in the House of

---

[16] The Court need not resolve whether 1791 or 1868 is the relevant focal point for the purposes of historical analogizing. *Contra* Pls. Mem. 8 n.1 (suggesting that "1791 history controls, not 1868 history"). The Second Circuit's thorough guidance in *Antonyuk*, 120 F.4th at 973–74, is instructive. While the meaning of the Second Amendment must "have the same scope" as it limits the States and the federal government, *id.* at 794 (quoting *Bruen*, 597 U.S. at 3), that meaning was not "calcified in either 1791 or 1868," *id.* Rather, "1791 and 1868 are both fertile ground, and the adjacent and intervening periods are likewise places in the historical record to seek evidence of our national tradition of firearms regulation." *Id.*

Assembly during session. *See* 1647 Md. Laws 216; *see also* 1650 Md. Laws 273. In 1786, Virginia's legislature enacted a prohibition similar to the Statute of Northampton that forbade most people from "com[ing] before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms." 1786 Va. Acts 33, ch.21. In 1776 and 1778, Delaware and New York enacted laws that prohibited individuals from bringing arms to a polling place during an election. *See* Del. Const. Art. 28; Act of Jan. 26, 1787 N.Y. Laws 345. Similarly, in 1835, Providence, Rhode Island, decreed that "No person shall fire any gun, pistol, rifle or other fire-arm . . . on any public lands within said city[.]" The Charter and Ordinances of the City of Providence, with the Acts of the General Assembly Relating to the City Page 60, Image 61 (1835). In sum, numerous Founding Era jurisdictions adopted laws against bringing arms to places where government business was being conducted, as the Supreme Court noted in *Bruen*, 597 U.S. at 30, 40.[17]

### B.    The Second Circuit's Decision in *Antonyuk* Is Controlling and Clarifying.

As noted above, the Second Circuit in *Antonyuk* reaffirmed that firearms restrictions in "government buildings" are "presumptively constitutional" under *Heller* and its progeny, but had no occasion to consider New York's government-property restrictions on appeal. Nevertheless, as the most recent authority on point, it bears discussing the Court of Appeals' holdings with respect to other "sensitive locations." *Antonyuk*, 120 F.4th at 1004–42.

First, the Second Circuit upheld New York's prohibition on carriage in any "location providing health, behavioral health, or chemical dep[e]ndance care or services." *Id.* at 1007 (quoting N.Y. Penal L. § 265.01-e(2)(b)). The State relied on three laws (two from 1837 and one from 1843) excluding alcoholics, the mentally ill, and the intellectually disabled from State

---

[17] This is consistent with Defendants' arguments above. While there are examples of firearms regulation in government buildings, which provide the historical analogues for the modern prohibitions, "comprehensive security" was not—contrary to Plaintiffs' argument—the historical *sine qua non* of "sensitive places."

militias, as well as a "general[] tradition of restricting firearms in locations frequented by vulnerable populations." *Antonyuk*, 120 F.4th at 1007–13. Those historical regulations imposed the same burden ("prohibiting firearm carriage") and for the same reason ("the protection of vulnerable populations") as their modern analogue. *Id.* at 1011. The Second Circuit specifically rejected the district court's insistence on a more precise relationship: "The New York legislature need not have attempted to protect the exact same subset of vulnerable persons for its regulation to be relevantly similar to these historical analogues." *Id.* at 1012.

Second, the Court of Appeals upheld New York's prohibition on firearms in public parks and zoos. *Id.* at 1015 (citing N.Y. Penal L. § 265.01-e(2)(d)). The State relied on six strands of historical analogues: (1) an 1870 Texas law prohibiting firearms "where persons [were] assembled for educational, literary, or scientific purposes"; (2) an 1883 Missouri Law pertaining to assemblies for "educational, literary or social purposes"; (3) two laws (one from 1889 in Arizona, one from 1890 in Oklahoma) prohibiting carriage "where persons [were] assembled for amusement or for educational or scientific purposes"; (4) ordinances from eight cities (between 1861 and 1897) prohibiting carry in public parks; (5) "the tradition of prohibiting firearms in schools"; and (6) Founding Era statutes in Virginia and North Carolina that barred firearms in fairs and markets. *Id.* at 1016–17, 1019–20. The Second Circuit accepted that this evidence, along with pre-Founding traditions dating to medieval England, amounted to "a well-established, representative, and longstanding tradition of regulating firearms in places that serve as public forums and, as a result, tend to be crowded." *Id.* at 1023. The court then agreed that New York's prohibition on firearms in parks imposed the same burden (prohibiting carriage) and for the same reason (maintaining order in often-crowded public squares) as its predecessors. With respect to zoos, the Second Circuit found the national history of regulating firearms in "densely trafficked public forums" and "spaces frequented by children" sufficient to uphold the prohibition. *Id.* at 1026.

Next, the Second Circuit upheld New York's prohibition on firearms in "any establishment holding an active license for on-premises consumption of alcoholic beverages where alcohol is consumed." *Id.* at 1027 (quoting N.Y. Penal L. § 265.01-e(2)(o)). The State cited five statutes (enacted between 1867 and 1889) that had banned carriage by intoxicated persons and two more (in 1870 and 1889) that had banned carriage in "a ball room, social party or social gathering." *Id.* at 1028 (quoting *Antonyuk*, 639 F. Supp. 3d at 332). Notably, none of the State's examples prohibited carriage in alcohol-serving establishments *per se*. *Id.* at 1031. Nevertheless, the Second Circuit found "a consistent and representative tradition of regulating access to firearms by people with impaired self-control or judgment, specifically those who are intoxicated," *id.* at 1030, and found that tradition to be sufficiently similar to the modern prohibition, *id.* at 1031.

Finally, the Second Circuit upheld New York's prohibition on carrying firearms in theaters.[18] *Id.* at 1032 (quoting N.Y. Penal L. § 265.01-e(2)(p)). Relying on five of the analogues discussed above to reiterate "a well-established and representative tradition of regulating firearms in quintessentially crowded places." *Id.* at 1038. Here again, none of the cited statutes had regulated theaters *per se*. *See id.* at 1038 n.112.

Several themes emerge from the Second Circuit's reasoning in *Antonyuk*. First, with the exception of parks, none of the challenged prohibitions found an exact predecessor in the history of our Nation, yet the Second Circuit upheld them all.  Second, the Court of Appeals relied almost exclusively on Reconstruction Era statutes. Third, the court rejected several arguments aimed at minimizing the number of States, or the percentage of the population, that were subject to the historical analogues. That is, the Second Circuit did not require any overwhelming consensus in order to find an apt tradition; often a mere handful of analogues sufficed. Finally, given the

---

[18] For reasons both procedural and jurisprudential, the Second Circuit did not have to consider New York's "wide-ranging ban on gun carriage in 'any place used for the performance, art entertainment, gaming, or sporting events.'" *Antonyuk*, 120 F.4th at 1032.

prohibitions that the Second Circuit upheld, the Court should consider the sheer anomaly that would result if Plaintiffs prevailed in this case: the government can constitutionally ban firearms in zoos, bars, and theaters, but not post offices? Given that post offices fall into a category ("government buildings") that is already "presumptively lawful," *id.* at 962, that cannot be.

### C.    Plaintiffs' Historical Arguments Are Based on the Misunderstanding of *Bruen* that *Rahimi* Was Meant to Correct, as Recognized in *Antonyuk*.

Plaintiffs argue that section 930(a) is unconstitutional as applied to Post Offices because firearm restrictions on government property had not yet expanded to post offices by the time of the Founding. *See generally* Pls. Mem. 10–13. But whether a firearm regulation is permissible, *Bruen* explains, depends on whether it is "consistent with"—not necessarily part of—that tradition. 597 U.S. at 19, 24. *Rahimi* emphasized and relied on that distinction. *See* 602 U.S. at 692. Nevertheless, Plaintiffs insist that [t]his case is a straightforward one." Pls. Mem 7.

First, Plaintiffs argue that the government is employing a regulation (banning firearms in post offices) that it could have, but did not, employ at the Founding. *Id.* at 12 ("From its infancy, the U.S. Postal Service faced armed threats and violent crime."). But the lack of Founding-era, post-office-specific firearm restrictions is neither dispositive nor surprising, because dedicated postal buildings were rare or non-existent at that time. The British Government furnished no postal buildings in the North American colonies, and the lack of dedicated accommodations continued long after the early American period. *See* Defs. Ex. 7 (Ruth Lapham Butler, *Doctor Franklin, Postmaster General* (1928)). Letters were left at public gathering spots such as taverns or inns, and local postmasters exercised their office from private residences. *Id.* Rather than existing in "government buildings," early post offices "moved with any change of the Postmasters in charge." *Id*. The first known colonial post office was a private tavern and residence designated by the General Court of Massachusetts in 1639. *See* Defs. Ex. 8 (Post Off. Dep't, 7 Collections of the Mass. Hist. Soc'y 3, 48 (1838)). New York City's first post office, opened in 1642, was housed in

a succession of coffee houses until 1804. *See* Defs. Ex. 9 (James Bruns, *Great American Post Offices,* at xii & 3 (1998)). There are no federal records on the buildings occupied by most early post offices. *See* Defs. Ex. 10 (U.S. Postal Service, *Publication 119: Sources of Historical Information on Posts Offices, Postal Employees, Mail Routes, and Mail Contractors*, at 14 (Nov. 2022)). Until the early 1900s, most post office quarters were provided by the postmaster at no charge to the Post Office Department (often in the postmaster's home or other place of business, such as a general store). *Id*. Accordingly, the lack of firearm prohibitions in "post offices" at the time of the founding is not inconsistent with a contemporaneous understanding that firearms could nevertheless be restricted in "government buildings," which post offices would only later become. *See, e.g.*, *Bruen*, 597 U.S. at 30. And firearms were indeed restricted in several types of government buildings at the time of the Founding, as explained above.

Second, Plaintiffs argue that our Founders perceived the same threat as Congress did in the 20th century but addressed that problem through materially different means. Pls. Mem. 12–13. To wit, "Congress enacted laws that offered bounties for the apprehension of postal robbers." *Id.* at 12. But the Founders could not have perceived a threat to "Post Offices" in the modern sense because—as explained above—those did not exist. *See, e.g.*, *Publication 119* (Defs. Ex. 10) at 14 (explaining that, until the early 1900s, most "post offices" were in fact the postmaster's home or place of other business). Perhaps that is why, instead of using the term "post office," Plaintiffs are careful to say "the *U.S. Postal Service* faced armed threats" and that "the enduring historical tradition has been to encourage the possession of weapons in conjunction with *mail services*." Pls. Mem. 12, 13.

Even so, Plaintiffs fail to substantiate their assertion as a matter of fact. Their *sole* example is a statute that paid $400 to a gentleman "for apprehending, and surrendering for trial, two slaves charged with having robbed the United States mail." *See* An Act for the Relief of D.W. Haley, Ch.

66, 25 Stat. 713 (1838). That hardly constitutes a "tradition" of anything. Moreover, it is not clear how Congress could have staved off "threats posed by robbers and Indians" through prohibitions on firearms. Holding prior Congresses to an impossible standard adds little to the analysis, and is precisely the misunderstanding of *Bruen* that *Rahimi* corrected.

*    *    *

The fundamental flaw in Plaintiffs' historical analysis is its myopic focus on post offices—which did not exist at the Founding as we know them now—largely to the exclusion of other government premises. That focus conflicts with *Bruen*'s directives, as applied in *Antonyuk*, and it renders firearm regulation almost impossible in most arenas, given the changes that have taken place over the past 250 years—including, especially, with respect to the federal government. As *Rahimi* emphasized through vivid metaphor, the Second Amendment does not countenance "law trapped in amber." *Rahimi*, 602 U.S. at 691. Yet Plaintiffs' argument *is* trapped in amber: it can be distilled to, "because there was no ban on firearms in post offices in the 18th century, there cannot be one today." *Cf.* Pls. Mem. 10–14.

The relevant question is whether a modern ban on firearms in Post Offices "is consistent with the *principles* that underpin our regulatory tradition," not whether it is identical to historical regulations. *Rahimi*, 602 U.S. at 692 (emphasis added). Thus, "[t]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Id.* at 691–92. The Court should reject Plaintiffs' over-exacting demand for restrictions on buildings that had not yet come into widespread existence and hold, for the reasons above, that the text and historical understanding of the Second Amendment are consistent with firearm restrictions in government buildings, including post offices.

**IV.    IF THE COURT FINDS A CONSTITUTIONAL VIOLATION, IT SHOULD ORDER SUPPLEMENTAL BRIEFING ON THE APPROPRIATE REMEDY.**

Plaintiffs ask for a permanent injunction "prohibiting Defendants from taking any action to enforce 18 U.S.C. § 930(g) [*sic*] against Nastri and members of We The Patriots U.S.A., Inc. anywhere in the United States." Pls. Mem. 28. Defendants acknowledge that injunctive relief is typically appropriate to redress the prospect of unconstitutional prosecution, but Plaintiffs' proposed injunction is overbroad and should be fleshed out through supplemental briefing before the Court enters an injunction on behalf of more than 18,000 plaintiffs that could affect more than 30,000 post offices, their employees, and their patrons.

First, Defendants assume that Plaintiffs meant to refer to 18 U.S.C. § 930(a) (which criminalizes possession of a firearm or dangerous weapon in a federal facility) and not Section 930(g), which merely defines "federal facility," "dangerous weapon," and "federal court facility." Defendants assume further that Plaintiffs only seek to enjoin enforcement of Section 930(a) to the extent that it applies to post offices. Plaintiffs have not attempted to argue that any other "federal facility" (*id.*) falls outside the "sensitive places" where firearms may be prohibited.

Second, the Constitution only affords the right for "ordinary, law-abiding, adult citizens" to bear arms for self-defense. *Bruen*, 597 U.S. at 31. The Supreme Court has not questioned, for example, "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626. We the Patriots USA, Inc. boasts more than 18,000 members. Pls. Mem. 28. It is far from certain that all members of that organization would qualify as "ordinary" and "law-abiding" under *Heller* and *Bruen*. Others may not be "adult[s]." *Bruen*, 597 U.S. at 31. And still others may not be licensed to carry firearms, which is another important (and accepted) limitation on the Second Amendment right. *See Heller*, 554 U.S. at 627. In any case, injunctive relief should be tailored to those who enjoy a Second Amendment right to bear arms for self-defense—which is not (as Plaintiffs' proposed injunction might otherwise suggest) everyone.

Third, some post offices would be "sensitive places" even on Plaintiffs' theory. For example, there is a post office at the Pentagon, and another at the State Department. There are post offices in congressional buildings, and on military bases. Any injunctive relief would need to exclude postal property that is comprehensively secured and is, therefore, a "sensitive place" even under Plaintiffs' definition. Thornier still, Plaintiffs' theory allows post offices to fluctuate between "sensitive" and not, depending on the security posture at any given moment. (This is one of the primary reasons why their argument should fail on the merits.) Because that posture can change from post office to post office, a uniform injunction would be patently overbroad.

The Court need not wade into these issues now—primarily because Plaintiffs should not prevail on the merits. But even if they do, an appropriate next step would be to order the Parties to meet, confer, and propose a schedule for addressing the scope of any injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should grant this motion and deny Plaintiffs' cross motion for summary judgment.

Dated:  January 17, 2025

Respectfully submitted,
BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Deputy Branch Director

/s/ *Jason C. Lynch*
JASON LYNCH (D.C. Bar No. 1016319)
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 514-1359
Email: Jason.Lynch@usdoj.gov

*Counsel for Defendants*