## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID J. NASTRI, ESQ., | : | |
| WE THE PATRIOTS USA, INC. | : | DKT No.: 3:24-cv-00222-VDO |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MERRICK GARLAND, in his official | : | |
| capacity only; LOUIS DEJOY, in his | : | |
| official capacity only | : | |
| | : | |
| Defendant. | : | February 17, 2025 |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION AND REPLY TO DEFENDANTS' COMBINED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The Defendants failed to engage with their responsibility under Supreme Court precedent to justify 18 U.S.C. § 930's ban on carrying handguns in Post Offices as being part of our nation's history and tradition. The Court is "not obligated to sift the historical materials for evidence…" to sustain 18 U.S.C. § 930. *New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111, 2150 (2022). The Defendants' failure to carry their historical burden is dispositive, and it requires the Court to deny their motion for summary judgment and grant the Plaintiffs' motion for summary judgment.

Thus, the Plaintiffs respectfully ask that the Court grant judgment in their favor, declare unconstitutional 18 U.S.C. § 930(g)'s prohibition on carrying firearms for self-defense in Post Offices, and permanently enjoin the Defendants from enforcing 18 U.S.C. § 930(g)'s prohibition on carrying firearms for self-defense in Post Offices against David Nastri and the 18,523 members of We The Patriots USA, Inc.

## **BACKGROUND**

It is hard to find a better member of his community than David Nastri. Nastri is a combat veteran, a financial advisor, an attorney, a kidney donor, and an active participant in his community. Def. L.R. 56(a)(2) Statement, ¶¶ 7-8.  His life is a veritable timeline of sacrifice and service to his nation and his community, and he has established a record of more than 30 years as a law-abiding and peaceable Connecticut citizen.

Nastri earned his Master's in Business Administration (M.B.A.) in 2001 from Quinnipiac University. *Id*. at ¶ 14. As a financial advisor, he currently holds four FINRA licenses, including a Series 7, a Series 63, a Series 66, and a Life & Health license. *Id*. at ¶ 19. In addition to passing the rigorous background checks required for these licenses, Nastri holds a clean disciplinary record for all of his financial licenses. *Id*. at ¶¶ 19-20.

His appetite for learning and ultimately giving back to his community did not stop there though. Nastri returned to school and earned his law degree in 2018 from Quinnipiac University. *Id*. at ¶ 14. He subsequently became an attorney duly licensed to practice law in Connecticut on November 2, 2018, and he remains in good standing with no record of a disciplinary history. *Id*. at ¶ 15. Since obtaining his law license, Nastri has represented numerous veterans in a pro bono capacity in Veterans' Administration matters during what spare time he has left over from his day job as a financial advisor. *Id*. at ¶¶ 15-18.

Nastri's service to his fellow citizens, community, and nation has been long and enduring. In 2009-2010, Nastri deployed to Afghanistan as a Staff Sergeant in the 1st Battalion, 102nd Infantry Regiment, Connecticut Army National Guard in support of Operation Enduring Freedom. *Id*. at ¶ 10. During his deployment, Nastri saw combat, and he earned several awards during his military service, including the Afghanistan Campaign

Medal with a Campaign Star, the Army Good Conduct Medal, and the Louisiana Emergency Service Medal. *Id*. at ¶¶ 9, 11. He received an honorable discharged in March 2012. *Id*. at ¶12.

Nastri has held a Connecticut pistol permit for approximately 30 years in good standing since receiving it, and he completed all of the safety training associated with obtaining it. *Id*. at ¶ 21. In addition to the civilian training that he received when he obtained his pistol permit, Nastri received comprehensive training from the United States Army during his military service on the safe and effective use of firearms, including handguns, and he was required to demonstrate proficiency in their safe and effective use under combat conditions. *Id*. at ¶ 13. He subsequently used that training in combat. *Id*. at ¶ 13. Nastri carries a handgun for the purpose of self-defense almost every place he goes. *Id*. at ¶ 22.

Nastri rents Post Office Box 427 at the United States Post Office located at 210 Maple Avenue, Cheshire, Connecticut 06410 ("the Cheshire Post Office") to receive business mail. *Id* at ¶ 23. He enters the Cheshire Post Office at least once or twice a month to check his mail. *Id*. at ¶ 24.  He intends to carry a handgun for self-defense whenever he enters the Cheshire Post Office just like he does when he goes any other place where its possession is not prohibited. *Id*. at ¶¶ 22, 25. He would like to do so without incurring federal criminal prosecution through the Defendants' enforcement of 18 U.S.C. § 930(a). *Id*. at ¶ 27.

Nastri is also a member of We The Patriots USA, Inc. ("WTP"). *Id*. at ¶ 2. WTP is a non-profit public charity dedicated to promoting constitutional rights, civil liberties, and other freedoms through education, outreach, and public interest litigation. *Id*. at ¶ 3. It

offers memberships to its supporters and the general public, and, as of October 29, 2024, WTP has 18,523 members across the United States. *Id*. at ¶ 5. Each member of WTP is subject to the same prohibition against carrying firearms into post offices as David Nastri is. *Id*. at ¶ 6.

## ARGUMENT

### I.    By Failing To Brief Their Objections To Plaintiffs' Local Rule 56(a)1 Statement, Defendants Have Waived Their Objections And Admitted Nearly All Of The Plaintiffs' Facts.

In accordance with D.Conn. Local Rule 56(a)(1), the Plaintiffs served a statement of material facts that broadly covered David Nastri's background, We The Patriots USA, Inc.'s background, and a survey of random Post Offices across Connecticut. *See generally* Pl. L.R. 56(a)(1) Statement. The Plaintiffs' statement of material facts also included a brief overview of the history of the American postal service published by Defendant DeJoy. *Id*. The Defendants served a Local Rule 56(a)(2) statement of material facts. *See generally* Def. L.R. 56(a)(2) Statement. Their statement did not include any additional facts and submitted to the Court that this case "turns solely on questions of law, not fact." *Id*. at p.1. Nonetheless, the Defendants responded to the Plaintiffs' statement of material facts with some admissions and denials and numerous relevancy objections. *See generally* Def. L.R. 56(a)(2) Statement.

At the outset, the Plaintiffs address three preliminary points. First, the Plaintiffs agreed, through the undersigned, that this case involved issues of law, and they also agreed to forego discovery. Their view of this case has not changed, and their briefing indicates their continued agreement with the Defendants that issues of law predominate this case. But the Court cannot operate without facts, especially facts that are necessary

to establish the Court's jurisdiction. The parties did not prepare a stipulation of facts, and their Rule 56 statements necessarily serve as the facts necessary to the cross-motions for summary judgment.

Second, the Plaintiffs did not know whether the Defendants would concede that they met their textual burden under *New York State Rifle and Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022) as outlined by the Second Circuit in *Antonyuk v. James*, 120 F.4th 941, 981 (2d Cir. 2024). Thus, the facts that they articulated were necessary and relevant.

Third, as the Defendants note, the Plaintiffs did indeed provide declarations from Brian Festa and David Nastri for the first time when they served their summary judgment papers. Def. L.R. 56(a)(2) Statement, p. 2, n.1. Even though the documents were not prepared until shortly before the service of the Plaintiffs' papers, Nastri and Festa always possessed that knowledge and evidence. There is no issue as to late disclosure as the Second Circuit has recognized that affidavits are appropriate at summary judgment to amplify or explain prior testimony, "especially where the party was not previously asked sufficiently precise questions to elicit the amplification or explanation." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1012 (2d Cir. 1996). The logical extension of this rule is that affidavits are also appropriate when a party is not asked at all about the knowledge that they possess. Thus, there is no prejudice or impropriety with Nastri and Festa's declarations.

Turning to the Defendants' responses, the Defendants object, expressly or by reference, to 32 of the Plaintiffs' 62 statements of fact. *See* Def. L.R. 56(a)(2) Statement, ¶¶ 7-20, 28-29, 33-48. Their objections fall into three categories:

1. The Defendants object to paragraph 7 as being irrelevant. They repeat the same objection by reference for paragraphs 8 through 20. *See* Def. L.R. 56(a)(2) Statement, ¶¶ 7-20.

2. The Defendants raise a relevancy and competency objection to paragraph 28. They repeat the same objection by reference for paragraph 29. *See* Def. L.R. 56(a)(2) Statement, ¶¶ 28-29.

3. The Defendants object to Paragraph 33 as being irrelevant. They raise the same objection by reference for paragraphs 34 through 48. *See* Def. L.R. 56(a)(2) Statement, ¶¶ 33-48.

The Defendants do not state denials to any of these paragraphs.

Local Rule 56 provides specific directions regarding how to respond to a Local Rule 56(a)1 statement:

> A party opposing a motion for summary judgment shall file and serve with the opposition papers a document entitled "Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment," which shall include a reproduction of each numbered paragraph in the moving party's Local Rule 56 (a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c). … All admissions and denials shall be binding solely for purposes of the motion unless otherwise specified. All denials must meet the requirements of Local Rule 56(a)3. *A party shall be deemed to have waived any argument in support of an objection that such party does not include in its memorandum of law*.

D.Conn. L.R. 56(a)(2)(i) (emphasis added). Furthermore, "[e]ach material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement …, or the Court sustains an objection to the fact." D.Conn. L.R. 56(a)1.

The Defendants' failure to argue their objections in their memorandum of law means that they have waived their objections. *See* D.Conn. L.R. 56(a)(2)(i). Their failure to dispute the Plaintiffs' stated facts in paragraphs 7-20, 28-29, and 33-48 requires the Court to deem them admitted for purposes of the parties' cross-motions for summary judgment.[1]

## II.    The Court May Not Use Dicta From *Heller* To Relieve The Defendants Of Their Burden To Justify Regulations On The Right To Keep And Bear Arms From Well-Established And Representative Historical Analogues.

The Defendants open their brief by arguing that "the constitutionality of regulating firearms in government buildings is settled." Def. Combined MOL, p. 3. They invite the Court to construe *District of Columbia v. Heller*'s dicta to impose a burden on the Plaintiffs to demonstrate that banning firearms in government buildings is not unconstitutional. *Id.* at pp. 3-5, 7-8. The Defendants' proposal though would require the Court to disregard *Bruen*'s instructions as to how Second Amendment analysis should be conducted. That, the Court cannot do.

*District of Columbia v. Heller*, 554 U.S. 570 (2008) did caution that

nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

---

[1] The Plaintiffs recognize that D. Conn. Local Rule 56(a)2 allows an opponent to admit, deny, "and/or" object to a statement of fact. While "and/or" might be read allowing the opponent to object to a paragraph of a Local Rule 56(a)1 statement without admitting or denying the paragraph, the Plaintiffs contend a party who elects to object to a fact without denying it does so at the party's own peril and risks admitting the fact if the court does not sustain the objection. Here, the Defendants could have avoided admitting Paragraphs 7 through 20, 28, 29, and 33 through 48 simply by denying them subject to their objections, had they wished to do so.

554 U.S. at 626-27. In a single footnote without further elaboration, *Heller* described these prohibitions as "presumptively lawful regulatory measures." *Id*. at 627 n.26.

The Defendants' view that this language somehow imposes a burden on the Plaintiffs to prove unconstitutionality ignores its context in *Heller* as well as the methodology articulated by *Bruen*.

Start with *Bruen*'s methodology. *Bruen* confirmed that Second Amendment analysis has two parts. The first part focuses on the Second Amendment's plain text and asks whether it covers an individual's conduct. *Bruen*, 142 S.Ct. at 2129-2130. The Plaintiffs bear their burden on this part, and, if they carry it, the Second Amendment "presumptively protects [their] conduct." *Id*. at 2130. Because nothing in the Second Amendment's plain text mentions a limitation on the right to bear arms – either in terms of weapons or places where they may not be carried, the Second Amendment's plain text does not endow any firearms regulation with a presumption of constitutionality, and it certainly does not impose a burden on the Plaintiffs to prove a firearm regulation unconstitutional. The second part of the Second Amendment analysis requires the Defendants to "justify [their] regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130.

There is no tension between *Bruen*'s methodology and *Heller*'s caution about presumptively lawful regulations. *Heller* devoted substantial time to determining what the plain text of the Second Amendment meant. 554 U.S. at 576-626. After determining that it protected an individual right to keep and bear arms, *Heller* had one more base to touch. "Like most rights, the right secured by the Second Amendment is not unlimited." *Id*. at 626. *Heller* then identified limitations on the right guaranteed by the Second Amendment's

plain text based on the information available to it. *Id*. at 626-28. It, however, cautioned that it was not undertaking "an exhaustive historical analysis" of the Second Amendment. *Id*. at 626. Its use of the term "presumptively lawful regulatory measures" was nothing more than a loose expression of what it considered to be historically justified regulations based on the information available to it. *Id*. at 627 n.26.

*Bruen* never used the term "presumptively lawful regulations." Instead, it confirmed that *Heller* was speaking of "limitations" in the passage at issue here. *Bruen*, 142 S.Ct. at 2128; *see also id*. at 2129 (identifying *Heller*'s analytical components as "defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation"). Thus, when *Bruen* reached the issue of "sensitive places," it explained that *Heller* made assumptions:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626, 128 S.Ct. 2783. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); *see also* Brief for Independent Institute as Amicus Curiae 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

*Id*. at 2133.

In other words, *Bruen* expressly stated that it, and *Heller*, were assuming that certain places were "sensitive places." *Id*. at 2133. *Bruen*, however, did not state that its assumption curtailed future litigation over prohibitions against carrying firearms in any of

the places in which it assumed that there was a historical tradition of prohibiting firearms. Nor did it state that its assumption that these places were "sensitive" relieved government of its obligation to historically justify the regulation under the methodology that it had, just paragraphs earlier, adopted.

Just as the Second Amendment must be understood in light of *Heller*, *Heller* must be understood in light of *Bruen*. *Bruen* does not remotely suggest or authorize a different Second Amendment framework for government buildings than for any other type of space. Nothing in *Bruen* gives the Defendants a get-out-of-historical-analysis-free card simply because *Heller* and *Bruen* made assumptions that remain untested in litigation. "That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense." *Bruen*, 142 S.Ct. at 70-71.  The Defendants bear the burden of proving that the prohibition on carrying firearms in Post Offices is historically justified just like they would in any other constitutional context.

The only presumption *Bruen* acknowledges is the presumption that the Second Amendment presumptively protects all conduct which is within the plain meaning of its text. *Bruen* teaches that firearms regulations are lawful only by analogy to similar historical regulations, and that it is the government which has the burden of showing such similarity. To conclude otherwise would be to ignore the whole point of *Bruen* as well as its express commands.

None of the authorities that the Defendants rely on compel a different conclusion. Def. Combined MOL, p. 5. *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) did not consider a challenge to a prohibition against carrying firearms on government property, and it did not discuss government buildings beyond quoting *Heller* and *Bruen*.

*Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024) considered a challenge to Colorado's law raising the minimum age to purchase firearms from 18 to 21, and it said nothing about locational based restrictions on the Second Amendment.

*United States v. Gailes*, 118 F.4th 822 (6th Cir. 2024) considered a criminal motion to dismiss an indictment charging the defendant with violating the federal prohibition against domestic violence offenders possessing firearms, and it did not consider locational based restrictions on the Second Amendment.

Like *Antonyuk*, *Wolford v. Lopez*, 116 F.4th 959, 989-992 (9th Cir. 2024) did consider, among other things, a facial challenge to carrying firearms in parking areas connected to sensitive places. Because the plaintiffs brought a facial challenge and the court concluded that at least some parking areas involving some government buildings were "sensitive," the Ninth Circuit did not adopt a more expansive definition of "government buildings" as "sensitive places." *Id*. at 990.

*Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) considered a challenge to Maryland's firearms licensing scheme. It did not consider a challenge to any locational-based regulation.

Likewise, *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) considered a motion to dismiss an indictment charging the defendant with possession of a firearm while he

was subject to a restraining order prohibiting him from possessing a firearm. The Fifth Circuit never considered a challenge to any locational-based regulation.

In sum, the Defendants' proffered authorities do not support its position. None of them engage in a detailed analysis as to what the *Heller* Court meant by referring to prohibitions against carrying in government buildings as "presumptively lawful." None of them engage with *Bruen*'s "how" and "why" metrics for determining whether a place is "sensitive." No surprise. Those questions and issues were never before them.

No court has adopted the Defendants' position. The Court should decline to be the first when such a step would defy *Bruen*.

### III. The Defendants' Apparent Argument That 18 U.S.C. § 930 Provides An Adequate Limiting Principle Is Insufficient To Carry Their Constitutional Burden. Neither Is Their Argument That The Law Has Never Been Successfully Challenged

The Defendants also appear to suggest that 18 U.S.C. § 930 contains enough limiting principles to pass constitutional muster. Def. Combined MOL, pp. 2-3. In particular, they submit that the prohibition against carrying firearms "only applies to buildings where federal employees regularly work" and only in cases where a notice of the prohibition is posted or where a person has actual notice of the prohibition. *Id*. at p. 2. This suggestion, however, does not square with the rest of the Defendants' brief.

The main thrust of the Defendants' argument is that *Heller* placed an insurmountable burden on the Plaintiffs to show that all prohibitions on carrying firearms in government buildings are unconstitutional. *Id*. at pp. 3-5, 7-8. As explained above, *Heller* does not impose such a burden on the Plaintiffs. In any event, the Defendants make no effort to untether their argument regarding the statute's criteria from their

argument about *Heller*'s dicta. They do not provide any explanation of how these "limiting criteria" comport with the characteristics of a "sensitive place."

The limiting criteria also would not apply to Plaintiff Nastri and any other members of We The Patriots USA, Inc. who are aware of 18 U.S.C. § 930. They are squarely within the class of persons who could, and would, be penalized for violating 18 U.S.C. § 930.

Nor are the statute's limiting criteria relevant to this case. The Plaintiffs are not making any due-process arguments. They are arguing that 18 U.S.C. § 930 violates their Second Amendment rights because it prohibits law-abiding persons who wish to carry a firearm for self-defense while patronizing a post office.

Lastly, the Defendants observe that § 930(a), which has been in effect since 1988, was never challenged on Second Amendment grounds until 2023 in *United States v. Ayala*, 711 F. Supp. 3d 1333 (M.D. Fla. 2024) – *see* Def. Combined MOL, p. 3 – although the similar federal regulation, 39 C.F.R. § 232.1(l), was challenged earlier. *See Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015); *United States v. Dorosan*, 350 Fed. App'x 874 (5th Cir. 2009). What other litigants and citizens have chosen to do is irrelevant to this case's merits. In any event, *Bonidy* and *Dorosan* are pre-*Bruen* cases that applied the means-end scrutiny that *Bruen* rejected to uphold the constitutionality of 39 C.F.R. § 232.1(l).

The Court should decline to entertain any suggestions to stray from *Bruen*'s methodology in pursuit of irrelevant considerations.

**IV.    The Defendants May Not Carry Their Historical Burden By Simply Calling The Plaintiffs' Historical Analysis Of "Sensitive Places" Wrong, And Their Failure To Engage With *Bruen*'s "How" And "Why" For "Sensitive Places" Is Fatal.**

The Defendants spend most of their historical analysis arguing that the Plaintiffs' argument for what characterizes a "sensitive place" is wrong. Def. Combined MOL, pp. 8-10, 12-20. In particular, the Defendants seem to focus all of their attention on arguing that the Plaintiffs' contention that "sensitive places" require comprehensive, government-provided security is wrong. *Id*. This approach is simply not enough to carry the day under *Bruen*.

*Bruen* requires the Defendants to "affirmatively prove that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127. Affirmative proof requires much more than claiming that the Plaintiffs are simply wrong about one of the metrics for a "sensitive place." Instead, *Bruen* teaches that there are two types of cases: straightforward ones and ones requiring a nuanced approach because of "unprecedented societal concerns or dramatic technological changes." *Id*. at 2131-32. If the case is straightforward because it "addresses a general societal problem that has persisted since the 18th century," the Defendants must show that earlier generations addressed the problem through materially similar means. *Id*. at 2131. If the case presents a unprecedented societal concerns or technological changes that require a nuanced approach, it requires the Defendants to "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id*. at 2132. That analogue must address "how and why the regulations burden[ed] a law-abiding citizen's right to armed self-defense." *Id.* at 2133.

The Plaintiffs engage with this inquiry. They first pointed to the fact that, despite Post Offices and postal services existing since prior to the Founding, there are no historical examples of prohibiting firearms in them. Pl. MOL (10/30/2024), p. 10. The

United States has already conceded that fact in *United States v. Ayala*, 711 F.Supp.3d 1333, 1340 (M.D.F.L. 2024). The Defendants also admitted that postal services existed in America as far back as 1673. Def. L.R. 56(a)(2) Statement, ¶ 51. The Defendants also admitted that the United States Postal System has faced armed threats and violent crime since its inception. *Id*. at ¶ 57.

The Defendants offer nothing in the face of these concessions and admissions. They do not point the Court to any laws that prohibited the carrying of firearms in post places in either the Founding or Reconstruction Eras. They do not argue that there are new societal concerns that justify prohibiting the carrying of firearms in postal places. They do not argue that new technological advances justify the prohibition either.

Instead, the Defendants open fire on their own position by detailing to the Court how local postmasters and post offices operated from private residences, private taverns, and coffee houses. Def. Combined MOL, pp. 25-26. Private residences, private taverns, and coffee houses are not, by any stretch of the imagination, "sensitive places," and the Defendants do not offer any evidence that firearms were banned where postmasters and post offices operated.

Ironically, the Plaintiffs have provided the Court with uncontroverted and admitted evidence that Post Offices still integrate into the community in similar ways. They share spaces with ordinary mixed commercial and retail establishments like pizza restaurants, salons, and convenience stores. *See* Def. L.R. 56(a)(2) Statement, ¶¶ 36, 38, 40, 44, 46, 48. Nothing has changed in over 234 years since the Second Amendment was ratified.

In sum, the Defendants' concessions, admissions, and proffered evidence proves that there is nothing unique about modern post offices. They derive from their historical

predecessors and face the same challenges and problems. There is no evidence that any American government addressed these problems by banning the carrying of firearms in post office locations. That is fatal to the Defendants' case.

Even if the inquiry were more nuanced, the Defendants still do not offer the Court a logical argument for how post offices are similar to legislative assemblies, courthouses, and polling places. They do not even try.

Instead, the Defendants reach back to the Statute of Northampton and similar laws to argue for an enduring tradition that prohibits the carrying of firearms before government officials. Def. Combined MOL, pp. 21-22. The American laws that they cite though all prohibit the carrying of firearms before courts, legislative assemblies, and in polling places. *Id*. The Defendants do not discuss why those laws were enacted or how they worked.

The Plaintiffs, however, did. Legislative assemblies, courthouses, and polling places are "critical forums where the core decisional processes of our republican institutions take place." Pl. MOL (10/30/2024), p. 18. Those decisional processes require "considered and independent decision-making regarding matters of self-government…" which "cannot reliably occur if the decisionmakers are not secure from the possibility of violence." *Id*. Statutes like the Statute of Northampton were enacted to protect these assemblies and proceedings. In fact, *Bruen* noted that the Statute of Northampton was a direct reaction to the "tendency to turmoil and rebellion" and "a more general spirit of insubordination" that "was everywhere apparent throughout the realm." 142 S.Ct. at 2139 (cleaned up).

The Defendants do not contest this proposition at all. They offer no evidence of a broader tradition than the one contemplated by the Statute of Northampton – protecting the critical decisional processes necessary to ensure the rule of law, not a society predicated on the violent survival of the fittest. It is their inescapable burden to do so though under *Bruen*. Thus, even assuming that the Plaintiffs are wrong on their argument for the second characteristic of comprehensive security – the "how" of *Bruen*, *see* Pl. MOL (10/30/2024), pp. 19-21, the Defendants still fail to counter the critical question of "why."

The Defendants also fault the Plaintiffs for not addressing schools as a "sensitive place" in their opening memorandum. Def. Combined MOL, p. 10. The Plaintiffs did not address schools as a "sensitive place" because *Bruen* relies on D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018) for its information about what places are relatively undisputed "sensitive places." *Bruen*, 142 S.Ct. at 2133. Kopel and Greenlee noted that it was not clear whether prohibitions on carrying firearms at schools fit within our nation's "sensitive places" history because they only applied to students, not faculty and staff. D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 249-252 (2018). *Bruen* itself cited an instance during Reconstruction where a Maryland mayor and sheriff warned "the colored people to go armed to school, (which they do)" and noted "that the superintend of schools came down and brought [the teacher] a revolver for his protection." *Bruen*, 142 S.Ct. at 2151 (cleaned up).

The dearth of Founding and Reconstruction Era precedent for schools renders them a thorny issue that might place them in a category of their own. For instance, it remains well-established that schools stood *in loco parentis* as to students and had

substantial authority to control student conduct, with an eye toward safety and order, sometimes in ways that exceed the constitutional limitations on the government's authority outside the schoolhouse gate. *See, e.g.*, *Morse v. Frederick*, 551 U.S. 393, 413 n.3 (2007); *State v. Pendergrass*, 19 N.C. 365, 366 (1837) (recognizing that the "teacher is the substitute of the parent"); *State v. Mizner*, 45 Iowa 248, 251 (1876); *North v. Bd. of Trs. of Univ. of Ill.*, 137 Ill. 296, 306 (1891) ("By voluntarily entering the university, or being placed there by those having the right to control him, [the student] necessarily surrenders very many of his individual rights."). While this tradition would certainly support disarming students, it is a far cry from supporting a tradition of disarming adults because schools are "sensitive places." Conversely, the Second Circuit found that the plaintiffs in *Antonyuk v. James*, 120 F.4th 941, 1011 (2d Cir. 2024) did not contest New York's argument that there was a historical tradition "of regulating firearms frequented by children…" to "protect a vulnerable population."[2]

Whatever the correct historical tradition is though, the Defendants do not argue that Post Offices are, in any way, similar to schools. Nor can they. They presented no evidence that vulnerable populations congregate in Post Offices. They presented no arguments about "why" and "how" a possible historical tradition of banning firearms in schools would relate to Post Offices. That is simply not the effort required by *Bruen*.

---

[2] Both Plaintiffs Nastri and We The Patriots USA, Inc. are plaintiffs in other federal Second Amendment litigation where schools have been raised as a potential historical analogue to prohibitions on carrying firearms in public parks. The undersigned represents them in those proceedings. The Plaintiffs do not concede in this litigation that the uncontested findings of the *Antonyuk* court about the tradition of schools are correct as a matter of our nation's history and tradition.

What remains is an uncontradicted factual record. The Plaintiffs have demonstrated that Post Offices are not places where a core decisional process of republican government takes place. Instead, Post Offices are merely services providers that the federal government does not segregate from ordinary mixed commercial and retail establishments like pizza restaurants, salons, and convenience stores. *See* Def. L.R. 56(a)(2) Statement, ¶¶ 36, 38, 40, 44, 46, 48**.** In other words, the Defendants do not treat them as "sensitive." Neither should the Court.

Lastly, the Defendants contend that the Court should reject the Plaintiffs' description of "sensitive places" because it would imperil firearms prohibitions in other government buildings such as Social Security offices, Veterans' Affairs hospitals, and NASA's Jet Propulsion Laboratory.

Finally, the Defendants contends the Court should reject Plaintiffs' description of "sensitive places" because it would imperil firearms prohibitions in other government buildings such as Social Security offices, Veterans' Affairs hospitals, and NASA's Jet Propulsion Laboratory. Def. Combined MOL, p. 10. They lament that "it may be that only a minority of government buildings would pass Plaintiffs' test." *Id*. at p. 10. Their ominous forecasts are unfounded. As to Veterans' Affairs hospitals, modern technological developments such as modern medical equipment that has an unfortunate tendency to discharge firearms without owner consent or action might very well be a basis for banning firearms in hospitals.[3] Similar concerns might very well justify a similar ban in NASA's Jet Propulsion Laboratory. As for Social Security Offices, the Defendants offer nothing about

---

[3] Tim Evans, *Gun discharges in MRI at Indianapolis Veterans Affairs hospital*, Indy Star (Dec. 31, 2015). Retrieved from https://www.indystar.com/story/news/2015/12/31/gun-discharges-mri-va-hospital/78136982/ (last checked February 17, 2025).

what makes them "sensitive" or whether there is any other historical basis to justify a prohibition on carrying firearms there. The responsibility does not lie with the Plaintiffs to disprove such a ban, but rather with the Defendants to justify it.

At the end of the day, the Defendants continually shirk their responsibility to historically justify 18 U.S.C. § 930's ban on carrying handguns for self-defense in Post Offices. *Bruen* requires that the Court hold them to their historical burden, and, if it finds that they have not met it, the Court should grant the Plaintiffs' motion for summary judgment and deny the Defendants' motion.

## V.    Government Proprietorship Does Not Create Zones Where The Bill Of Rights Ceases To Exist, And That Includes Post Offices.

The Defendants' arguments under the Property Clause and Post Office Clause are so dismissive of the Bill of Rights as to be shocking. Def. Combined MOL, pp. 10-12. They argue that Congress has unlimited power over public land. *Id*. at p. 11. The suggestion from this argument is very thinly veiled: The Bill of Rights offers no protection in United States Post Offices.

The natural conclusion from the Defendant's logic is that,as long as the government owns the property (and/or has employees regularly working there, although it is unclear why the presence of employees would matter) upon which a hapless individual stands, the government can persecute that person because of his religion or political views, subject him to humiliating and unnecessary searches without probable cause, confine him without probable cause indefinitely, deny him an attorney, extract confessions via torture, convict him of a crime without a jury trial, and impose drawing and quartering as his punishment—all in the name of safety and order, of course.

Where does that argument end? Of course, the Defendants will likely vehemently deny that this parade of horribles is the logical conclusion of their argument, but then their argument turns into a wink-wink nod-nod proposition: The Second Amendment does not offer any protection on government property.

Not so. "The constitutional right to bear arms in public for self-defense is not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S.Ct. at 2156 (cleaned up). In other words, if other constitutional rights apply in Post Offices, then the Second Amendment does, absent a well-established and representative historical analogue demonstrating that it does not.

Fortunately, the Property Clause does not transform the federal government into a tyrant more terrible than King George III, and no such insidious powers hide between the benevolent-looking lines of the Post Office Clause—if for no other reason that the Bill of Rights was created precisely to restrain the federal government in the exercise of its general constitutional powers. *Ayala* saliently explained that the central flaw of the government's proprietorship theory is that it does not square with *Bruen* or the structure of the Constitution more generally:

> Beyond its scant analogical reasoning and its appeals to dicta, the United States' supplemental brief argues that its power to exclude individuals from its own property includes "the lesser power to restrict the actions or conduct of visitors as a condition of admittance." Gov't Suppl. Br. at 12.
>
> This idea does not fit cleanly into *Bruen*'s established framework. Instead, the United States seems to contend that it need not apply the Second Amendment at all to its property. It is one thing for the United States to fail to carry its burden under *Bruen* to fully marshal the historical record. As I have demonstrated above, courts can (but need not) address such failures by conducting independent historical research. It is another thing entirely to imply that a separate legal principle—whatever that might be—narrows the constitutional right to bear arms outside the Supreme Court's ordinary analytical framework. Accordingly, any "government-as-property-owner"

idea distinct from *Bruen* presents a separate legal issue from the "searching analysis into the historical record" undertaken above.

The United States dedicates only a handful of pages to advancing its government-as-proprietor theory and does not explain how that theory interacts with *Bruen* or any other Second Amendment precedent. See *id.* at 11–14, 142 S.Ct. 2111. The United States simply asserts that at least some gun regulations—those governing citizens whose daily lives bring them onto government property—are exempt from Second Amendment analysis. I can find no support for that proposition in the Supreme Court's cases, and the United States furnishes none. Furthermore, although I do not disagree that "[t]he government has more flexibility to regulate when it is acting as a proprietor," *id.* at 12, 142 S.Ct. 2111, that does not mean it can bring *criminal charges* for conduct that occurs on its property regardless of an individual's constitutional rights. Applying that principle in any other context reveals its absurdity. Would an indictment for failing to submit to a full body cavity search when showing up at the District of Columbia Department of Motor Vehicles to apply for a learner's permit pass Fourth Amendment muster? Or could the United States charge the adherent of a non-favored religion with trespass for entering government property without offending the Free Exercise or Establishment Clauses? I think not.

....

The United States must point to a historical tradition justifying any claimed power to regulate conduct protected by the Second Amendment's plain text, even as a proprietor. See *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111. As discussed in detail above, the United States identifies no such tradition.

*Ayala*, 711 F. Supp. 3d. at 1352-54.

Thus, the government's powers as proprietor are subject to the limitations of the Second Amendment. Although the Property Clause and Post Office Clause vest Congress with ample authority to maintain order in government facilities and make sure the postal service operates safely and efficiently, they do not confer carte blanche to trample on the constitutionally enshrined rights of persons who visit post offices for no more sinister purpose than checking their mail or obtaining another postal service.

The decisions the Defendants cite do not suggest otherwise. In *United States v. City of San Fransisco*, 310 U.S. 16 (1940), the Supreme Court upheld the authority of

Congress, pursuant to the Property Clause, to prohibit San Fransisco from selling to a private utility company the right to sell electricity generated on certain lands within Yosemite National Park and Stanislaus National Forest. *See id.* at 18-19, 29-30. Although San Fransisco claimed the prohibition—to which it had expressly consented in exchange for the right to conduct hydroelectric operations in the area—was "an unconstitutional invasion of the rights of the State of California," *id.* at 29, it is unclear what right San Fransisco contended the prohibition violated. San Francisco's argument that it was not "not within the constitutional authority of Congress," *id.* at 19, suggests merely the Property Clause was at issue. In any event, the case did not concern any constitutional right of an individual. The Defendants also cite *United States v. Gliatta*, 580 F.2d 156 (5th Cir. 1978), which merely held that the Property Clause and Post Office Clause give Congress the power to regulate traffic in post office parking lots. *See id.* at 157, 160. "Crossing the yellow stripe" and "driving with excessive speed," *id.* at 160, do not implicate the Bill of Rights. Thus, *Gliatta* does not shed any light on how the Second Amendment applies in post offices.

Ultimately, the Defendants' argument pursuant to the Property Clause and Post Office Clause is simply another attempt to skirt the burden *Bruen* imposes, which they cannot carry. *Bruen* gave specific instructions about how to analyze whether a modern law violates the Second Amendment, and those instructions did not include looking at Article I, Section VIII powers of Congress such as the Post Office Clause, or Article IV's provisions regarding the relationship between the federal government and the states, including the Property Clause. Simply put, the Bill of Rights limits the enumerated powers of the federal government, not vice versa. Therefore, the Court should reject the

Defendants' invitation to overshadow the Second Amendment with general powers of Congress.

## VI.    The Defendants' Reliance On *Rahimi* and *Antonyuk* Is Unavailing Because The Defendants Fail To Provide Any Analogical Reasoning At All.

After spilling much ink attempting to invert *Bruen*'s framework, the Defendants argue that, even if they bear a burden of justifying 18 U.S.C. § 930(a) by showing it is consistent with the nation's history and tradition of firearms regulation — they unequivocally do – they would still prevail because *Bruen* requires only a "well-established and representative historical analogue," not a "historical twin" or "dead ringer." 142 S.Ct. at 2133. But, instead of providing the necessary analogical reasoning, the Defendants point to *Antonyuk* and contend that it would be anomalous if the government could ban guns in "zoos, bars, and theaters" but not post offices, Def. Combined MOL, p. 24. That is simply not enough.

The Defendants must provide some historical analogue, and their analogical reasoning must feature (at least) similarities between the "why" and the "how" of the challenged regulation. *United States v. Rahimi*, 144 S.Ct. 1889, 1898 (2024) (explaining that "[w]hy and how the regulation burdens the right are central to this inquiry" into whether "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit.").

The Defendants fail to furnish either. Although they contend there is a history and tradition of "[s]afekeeping [p]laces [w]here [g]overnment [b]usiness [w]as [c]onducted, Def. Combined MOL, p. 21, the examples they cite are the same places *Bruen* identified—legislative assemblies, polling places, and courthouses. Def. Combined MOL, p. 21 ("before the King's justices" and "other of the King's ministers doing their office") (citing

*Bruen*, 597 U.S. at 40 (citing in turn 2 Edw. 3 c. 3 (1328))), 21-22 (Maryland's House of Assembly), and 22 (Delaware and New York polling places).[4]

These examples demonstrate nothing more than *Bruen* established. Moreover, the Defendants make no attempt to draw analogies between them and post offices. The type of business conducted in post offices is not "government business," Def. Combined MOL, p. 21, of the sort conducted in legislative assemblies, polling places, and courthouses, and the Defendants do not make any showing that the principles which underly prohibiting firearms in those areas also apply to post offices, or that the regulations themselves are "relevantly similar" to § 930. *See Rahimi*, 144 S.Ct. at 1898.

Nor should the Court rest its decision on the flimsy reed that is *Antonyuk*. *Antonyuk* itself cautioned that it was "reviewing facial challenges… at a very early stage of this litigation" and that it was not issuing a "full merits decision." 120 F.4th at 1048 n.126. In other words, *Antonyuk* itself may be decided differently after a full historical analysis.

Even so, *Antonyuk*'s rationales for disarming intoxicated persons and protecting children and theater audiences are inapplicable to post offices. No anomaly would result from ruling that a law-abiding adult need not disarm himself before entering a postal facility. It would be anomalous, though, to hold the same law-abiding adult has a right to carry a gun for self-defense anywhere between his home or place of business and the post office, but must, as *Dorosan* suggests, park somewhere else and store his pistol before going about the mundane affair of checking his mail.

---

[4] The Defendants also cite a Providence, Rhode Island ordinance from 1835 which prohibited discharging a firearm in Providence. It is unclear how this ordinance is relevant, as § 930 does not prohibit discharging a firearm and the entire City of Providence is not a government building or place where government business is conducted.

Instead of engaging in the kind of analogical reasoning *Bruen* requires-—*i.e.*, drawing similarities between the how and the why of the regulation and a historical antecedent — the Defendants seem to argue circularly that post offices are like Founding-Era government buildings because there were no post offices in the Founding Era. Instead, post offices, they say, were housed in distinctly non-governmental buildings like residences, taverns, inns, and coffee houses.

Contending that the first post offices were in residences and places of public accommodation only goes to show there is nothing special about post offices that makes them sensitive places, and there never was. The Second Amendment, as originally understood, no more permits banning firearms in the local USPS store than it does in the neighboring deli or dollar store.

Contrary to how the Defendants frame the Plaintiffs' arguments, the Plaintiffs do not miss the point of *Rahimi*. They do not question that a modern regulation may be constitutional if it "is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. But what are those principles? The Defendants do not tell us, so there is no way of knowing whether the principles that justify banning guns in the halls of Congress also justify banning guns in post offices, based on the Defendants' arguments.

In short, the Defendants completely fail to engage in meaningful analogical reasoning. Thus, their entire argument hinges on whether the Court follows *Bruen* or disregards its instructions. The Court should not disregard *Bruen* and find that the Defendants have failed to carry their burden.

**VII.    There is no need for further briefing on the scope of injunctive relief, as the Plaintiffs are entitled to a permanent, nationwide injunction against 18 U.S.C. § 930(a) as applied to post offices.[5]**

The Defendants contend that, even if § 930(a) is unconstitutional as applied to post offices, the scope of injunctive relief the Plaintiffs are seeking is inappropriate because (1) some members of We The Patriots USA, Inc., may not have the right to bear arms and/or may not be licensed to carry firearms and (2) some post offices might be "sensitive places" even if not all of them are – *e.g.*, the Post Office in the Pentagon or State Department.

With respect to the membership of We The Patriots USA, Inc., the Plaintiffs offer two responses: First, the Defendants proposed foregoing discovery in this case. They did so without any suggestion that the age, mental condition, or criminal history of any of the members of We The Patriots USA, Inc., would be important at any stage. Second, *Heller* is perfectly clear that "the people" are "all members of the political community," and that the right to keep and bear arms belongs to "all Americans." *Heller*, 554 U.S. at 580-81. Other federal laws regulate the possession of firearms by felons, children, and the mentally ill, and the Defendants will remain free to enforce them. States that have licensing schemes have the ability to enforce them. This case does not involve any question of whether the members of We The Patriots USA, Inc., comply with such laws. The only question before the Court is whether § 930(a) infringes their right, as members

---

[5] As the Defendants observe, the Plaintiffs' *Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment* erroneously refers to "§ 930(g)" in several places where "§ 930(a)" was meant. To be clear, the Plaintiffs seek an injunction against the enforcement of 18 U.S.C. § 930(a), which is the criminal prohibition on possessing or introducing a firearm into a Federal facility, as applied to post offices. The undersigned apologizes for the typographical errors.

of "the people," to bear arms. The Defendants' suggestion that § 930(a) could be enforced against a mentally ill person or child, but not a law-abiding adult, asks the Court to misconstrue the law to regulate something that it does not in an effort to buy the law a few more days of life if the Court decides this case in the Plaintiffs' favor. The Court should not delay relief for a futile endeavor.

As for the Defendants' suggestion that some exceptional post offices might be sensitive places even if ordinary post offices are not, this issue does not warrant limiting the scope of injunctive relief. Once again, it was Defendants' election not to develop and evidentiary record in this case as they believed the case involved pure questions of law.

Furthermore, the Defendants have identified only two postal locations that might be sensitive: one in the Pentagon and one in the State Department. The Defendants elected not to present any facts concerning either location. In any event, Post Offices within the State Department or the Pentagon are in no danger of being frequented by gun-carrying patrons because any injunction issued by the Court will not prohibit the Defendants from enforcing 18 U.S.C. § 930(a) at the doors of the Pentagon or the State Department, which would necessarily disarm patrons of the Post Offices within their walls. *See*, *e.g.*, 32 C.F.R. § 234.10 (prohibiting unauthorized persons from possessing, carrying, or using a weapon on the Pentagon Reservation). Thus, anyone who enters either building with an unauthorized firearm will be subject to prosecution regardless of whether he or she enters the post office located therein. The same is true for other post office locations which may be inside other federal facilities where 18 U.S.C. § 930(a) constitutionally applies. Therefore, enjoining enforcement of § 930(a) as to all post offices

would not immunize anyone found with a gun in the Pentagon or State Department post office.

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully ask the Court to deny the Defendants' cross motion for summary judgment, grant their motion for summary judgment, declare unconstitutional 18 U.S.C. § 930(g)'s prohibition on carrying firearms for self-defense in Post Offices, and permanently enjoin the Defendants from enforcing 18 U.S.C. § 930(g)'s prohibition on carrying firearms for self-defense in Post Offices against David Nastri and the 18,523 members of We The Patriots USA, Inc.

The Plaintiffs,

By: /s/ Cameron L. Atkinson /s/
Cameron L. Atkinson, Esq.
(ct31219)
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com

## **CERTIFICATION OF SERVICE**

The undersigned hereby certifies that, on the foregoing date, a copy of the foregoing and its exhibits was served on all parties' counsel by electronic mail pursuant to the Court's September 3, 2024 order (Dkt. 14) in this case.

On the date that this document is electronically filed, notice of this filing will be sent by email to all parties and counsel of record who have appeared by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ Cameron L. Atkinson /s/