UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------------------  x

DAVID J. NASTRI, ESQ. *et. al.*,                    :
                                                    :
                                Plaintiffs,         :
                                                    :       **MEMORANDUM &**
        -against-                                   :       **ORDER**
                                                    :
PAMELA BONDI, in her official capacity, and         :       3:24-CV-222 (VDO)
DAVID P. STEINER, in his official capacity, [1]     :
                                                    :
                                Defendants.         :
----------------------------------------------------------------  x

**VERNON D. OLIVER**, United States District Judge:

Before this Court are the parties' cross-motions for summary judgment.[2] For the

following reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment and

**DENIES** Plaintiffs' Motion for Summary Judgment.

I.      **BACKGROUND**

This case presents a challenge by David Nastri and We The Patriots USA, Inc. ("We

the Patriots" or "WTP") (collectively, "Plaintiffs") to the constitutionality of 18 U.S.C. §

930(a), a 1988 federal statute that prohibits firearms in federal facilities, specifically as applied

to post offices. Plaintiffs bring this claim against Pamela Bondi, the U.S. Attorney General,

and David Steiner, the U.S. Postmaster General, in their official capacities (collectively,

"Defendants").

---

[1] On February 5, 2025, Pamela Bondi became the U.S. Attorney General, and on July 15, 2025, David P. Steiner became the U.S. Postmaster General. Thus, pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of Court is directed to substitute (1) Pamela Bondi for Merrick Garland, and (2) David P. Steiner for Louis DeJoy, in this action.

[2] *See* ECF Nos. 26 (Plaintiffs' Motion) and 28 (Defendants' Motion).

Plaintiff David Nastri, a citizen of Connecticut, has held a Connecticut pistol permit for approximately 30 years.[3] The permit has been in good standing since Mr. Nastri received it, and he completed all safety training associated with obtaining it.[4] "Mr. Nastri carries a handgun for the purpose of self-defense almost every place he goes."[5] He is a member of plaintiff WTP, "a nonprofit public charity . . . dedicated to promoting constitutional rights, civil liberties, and other freedoms through education, outreach, and public interest litigation."[6]

As relevant here, Mr. Nastri rents a post office box at a United States Post Office located in Cheshire, Connecticut to receive business mail.[7] He enters that post office approximately once or twice a month to check his mail.[8] Mr. Nastri asserts that he would like to carry his handgun for self-defense whenever he enters the post office without incurring federal criminal prosecution through the Defendants' enforcement of 18 U.S.C. § 930(a).[9] Other members of WTP are "subject to the same prohibition against carrying firearms" into post offices as Mr. Nastri.[10]

Plaintiffs filed the complaint in this case on February 20, 2024.[11] Following the Defendants' answer[12] and the parties' subsequent joint Rule 26(f) report, the Court adopted

---

[3] L.R. 56(a)(2) Statement of Facts in Opposition to Summary Judgment, ECF No. 28-1 ¶ 21.

[4] *Id.*

[5] *Id.* ¶ 22.

[6] *Id.* ¶¶ 2–3.

[7] *Id.* ¶ 23.

[8] *Id.* ¶ 24.

[9] *Id.* ¶ 27.

[10] *Id.* ¶ 6.

[11] Compl., ECF No. 1.

[12] Answer, ECF No. 12.

the parties' agreement that this case presents "a question of law that can be resolved on cross motions for summary judgment after little to no discovery."[13] The cross-motions for summary judgment followed. In deciding the pending cross-motions, the Court has reviewed all relevant briefing and the record in the case.[14]

## II.   <u>LEGAL STANDARD</u>

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. Rule 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A court "must review the record taken as a whole" to determine whether genuine issues of fact exist. *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 227 (2d Cir. 2024) (cleaned up). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson*, 477 U.S. at 248). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Courts resolve "all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). The same standard applies when parties file cross-motions for summary judgment: "each party's motion must be examined on its own merits, and in each

---

[13] Scheduling Order, ECF No. 14.

[14] *See* Pls.' Mot. Summ. J., ECF No. 26; Defs' Mot. Summ. J. and Opp'n, ECF No. 28; Pls.' Opp'n and Reply, ECF No. 29. The Defendants waived their right to file a Reply. *See* ECF No. 24.

case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## III.  <u>DISCUSSION</u>

Plaintiffs assert that 18 U.S.C. § 930(a), which threatens a fine or imprisonment of up to one year for a person that "knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility," specifically as applied to post offices, is unconstitutional under the Second Amendment.

### A.    Standing

As an introductory matter, this Court must ascertain that it has subject matter jurisdiction over the Plaintiffs' claims. "To establish Article III standing, a plaintiff must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Silva v. Farrish*, 47 F.4th 78, 86 (2d Cir. 2022) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Constitutional standing is designed to ensure the federal courts do not exceed their traditional authority. *Id.* Standing is an essential part of a plaintiff's case, and each element must be supported. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

The Plaintiffs have alleged a facial pre-enforcement challenge. A plaintiff only has standing to bring such a challenge when the "fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative.'" *Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013). In the context of a pre-enforcement challenge, "a plaintiff must [have]: (1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest'; (2) that the intended conduct is 'arguably proscribed by' the challenged regulation;

and (3) that 'there exists a credible threat of prosecution thereunder' that is 'sufficiently imminent.'" *Upsolve, Inc. v. James*, 155 F.4th 133, 139 (2d Cir. 2025) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (cleaned up). The claim of possible future injury is not sufficient to confer standing. *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

To satisfy the injury in fact element, a plaintiff must have suffered an invasion of a "legally protected interest which is concrete and particularized . . . [which means] the injury must affect the plaintiff in a personal and individual way." *Lujan,* 504 U.S. at 560, 560 n.1. A plaintiff may not sue to vindicate the statutory rights of others. *See Spokeo*, 578 U.S. at 341; *see also Singleton v. Wulff*, 428 U.S. 106, 114 (1976) ("one may not claim standing . . . to vindicate the constitutional rights of some third party").

Here, the Court is persuaded that Mr. Nastri has standing to bring his claim. Mr. Nastri has held a pistol permit for over three decades, and, by his own assertion, carries a handgun for self-defense purposes almost every place he goes. He has also made clear his desire to carry a handgun into the federal post office which he frequents at least once or twice a month, but for the fear of incurring federal criminal prosecution under the statute he challenges here. These facts indicate that Mr. Nastri intends to engage in conduct arguably proscribed by 18 U.S.C. § 930(a) and that there is a sufficiently imminent threat of enforcement. *See Nastri v. Dykes*, No. 23-1023, 2024 WL 1338778, at *1 (2d Cir. Mar. 29, 2024) ("[W]hen it is 'apparent' that the plaintiff's conduct is 'subject to the statute,' we presume that there exists a credible threat of enforcement – whether or not a plaintiff points to additional evidence – and require

the government to show otherwise."). Thus, Mr. Nastri has demonstrated that there is a cognizable injury in fact in the context of a pre-enforcement challenge to 18 U.S.C. § 930(a), as articulated by *Upsolve, Inc. v. James*, 155 F.4th 133, 139 (2d Cir. 2025).

Turning to plaintiff We The Patriots, an organization can assert Article III standing by claiming that it "suffered an injury in its own right or, alternatively, it can assert standing solely as the representative of its members." *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 199 (2023) (cleaned up). The former approach, asserting injury suffered directly by the organization, is known as "organizational standing." The latter approach, where an organization sues as the representative of its members, is known as representational or associational standing. *Id.*; *see also A.H. by E.H. v. New York State Dep't of Health*, 147 F.4th 270, 276 (2d Cir. 2025) (citing *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021)). "To assert representational standing, an organization must show '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Succow v. Bondi*, No. 25-CV-250 (SVN), 2025 WL 3677799, at *3–4 (D. Conn. Dec. 18, 2025) (quoting *Hunt v. Wash. St. Apple Advert. Com'n*, 432 U.S. 333, 343 (1977)). "The association must allege that its members, *or any one of them*, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (emphasis added).

Here, plaintiff We The Patriots asserts it proceeds under the latter theory, bringing claims "in a representative capacity" on behalf of its members.[15] Because it has successfully alleged that at least one of its members, Mr. Nastri, is suffering a threatened constitutional injury under the Second Amendment, it meets the first prong of the test for associational standing. In other words, We The Patriots has shown that at least one of its members can sue in their own right. The alleged Second Amendment interests, the Court finds, are germane to We The Patriots' purpose, thereby satisfying the second prong of the test for representative standing. And, finally, the Court finds the relief requested does not require the participation of We The Patriots' individual members in this lawsuit. For these reasons, the Court finds that the second plaintiff, We The Patriots, has associational standing in this matter. The Court now turns to the merits of the Plaintiffs' challenge.

### B.    Second Amendment Principles

The Second Amendment, applicable to the states through the Fourteenth Amendment, provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Circuit follows a two-step framework to evaluate challenges under the Second Amendment in the wake of recent decisions by the Supreme Court, which fundamentally altered the landscape of Second Amendment jurisprudence. First, a challenging party "must establish that "the Second Amendment's plain text covers an individual's conduct." *Frey v. City of New York*, 157 F.4th 118, 127 (2d Cir. 2025) (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022)). Then, "[i]f the plaintiff surmounts this initial textual hurdle, the burden

---

[15] Compl., ECF No. 1 at 2.

shifts to the government to prove that the challenged law is 'consistent with the Nation's historical tradition of firearm regulation.'" *Id*. (quoting *Bruen*, 597 U.S. at 24).

The right to keep and bear arms under the Second Amendment, though "not limited to service in an organized militia," *Antonyuk v. James*, 120 F.4th 941, 961 (2d Cir. 2024), is also "not *un*limited." *District of Columbia v. Heller*, 554 U.S. 570, 595, 626 (2008) (emphasis added). Historically, "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Nor has the right ever been understood to "protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. "Stated differently, the Second Amendment protects the right to keep and bear the sorts of weapons that are in common use—a limitation that is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Antonyuk*, 120 F.4th at 961 (cleaned up).

Thus, at step two, a court "must ascertain whether the [challenged] law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Frey*, 157 F.4th at 127 (quoting *United States v. Rahimi*, 602 U.S. 680, 692 (2024)). Crucial to this inquiry is "[w]hy and how the regulation burdens the right." *Rahimi*, 602 U.S. at 680. Because the framework established under *Bruen* was "not meant to suggest a law trapped in amber," 597 U.S. at 691, "this analogical reasoning 'requires only that the government identify a well-established and historical *analogue*, not a historical *twin*' or a 'dead ringer.'" *Frey*, 157 F.4th at 127 (quoting *Bruen*, 597 U.S. at 597).

The Second Circuit has stressed that "courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding

Era, the Antebellum Era, and Reconstruction." *Antonyuk*, 120 F.4th at 970; *see also Bruen*, 597 U.S. at 27 ("[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."). Thus, a lack of distinctly similar historical regulations during one or more of those time periods "may not be reliably dispositive in Second Amendment challenges to laws addressing modern concerns." *Antonyuk*, 120 F.4th at 970; *see also Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213 (2d Cir. 2025) ("The apparent absence of an exact historical analogue [to a challenged statute], however, is not necessarily determinative."). "Reasoning from historical silence is [also] risky," because "[l]egislatures past and present have not generally legislated to their constitutional limits," and it is thus "not necessarily the case that, if no positive legislation from a particular time or place is in the record, it must be because the legislators then or there deemed such regulation inconsistent with the right to bear arms." *Antonyuk*, 120 F.4th at 969.

The Second Circuit has further underscored that it is "not dispositive whether *comparable* historical regulations exist in significant numbers." *Id.* at 97. Indeed, as an example that will prove relevant to the instant challenge, the Supreme Court has stated that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" were "longstanding" and "settled," notwithstanding that "the historical record yields relatively few 18th- and 19th- century 'sensitive places' where weapons were altogether prohibited." *Bruen*, 597 U.S. at 30 (cleaned up). That was because the Court was "aware of no disputes regarding the lawfulness of such prohibitions." *Id.* Therefore, especially where there is a lack of constitutional dispute regarding a type of gun regulation, or "if courts during that period upheld similar governmental practices against similar constitutional challenges,"

"comparable historical laws need not proliferate to justify a modern prohibition." *Antonyuk*, 120 F.4th at 969, 972.

"The Supreme Court has explicitly sanctioned looking to post-Founding history in understanding the original public meaning of the Second Amendment in 1791." *Frey*, 157 F.4th at 129. The *Heller* Court, in examining how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century, explained that "the examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is "a critical tool of constitutional interpretation." 554 U.S. at 605 (second emphasis added). And *Bruen* reaffirmed the appropriateness of relying on post-Founding history as evidence of the public understanding of a Constitutional provision at the time of the Founding. 597 U.S. at 35.

"To be sure, *Bruen* cautioned that we should not give 'postenactment history more weight that it can rightly bear.'" *Frey*, 157 F.4th at 130 (quoting *Bruen*, 597 U.S. at 35). A court, for example, cannot rely on later history if it "contradicts what the text says." *Bruen*, 597 U.S. at 36. Moreover, a court's reliance on 19th-century evidence should be "secondary" where there is a "wealth of authority" from the Founding era. *Id.* at 37. However, those observations "do not require courts to reflexively discount evidence from the latter half of the 19th century absent indications that such evidence is inconsistent with the national tradition." *Antonyuk*, 120 F.4th at 1029 (cleaned up).

### C.    Federal Facility Ban, as Applied to Post Offices

The Court now turns to the Second Amendment challenge presented in this appeal. As noted, 18 U.S.C. § 930(a) (also referred to as the "Federal Facility Ban"), threatens a fine or imprisonment of up to one year for a person that "knowingly possesses or causes to be present

a firearm or other dangerous weapon in a Federal facility." A "Federal facility" is defined as "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." 18 U.S.C. § 930(g)(1). Here, Plaintiffs limit their challenge of the Federal Facility Ban specifically as it is applied to Post Offices.

The Court concludes at the outset that Plaintiffs have satisfied the requirements under step one of the *Bruen* analysis—there is no dispute that Plaintiffs, by asserting that they intend to carry firearms for the purpose of self-defense in United States Post Offices, have carried their burden to show that the Second Amendment's plain text covers their conduct. *See also United States v. Ayala*, 711 F.Supp.3d 1333, 1340 (M.D. Fl. Jan. 12, 2024) (concluding that "[p]ossessing a firearm in a Federal facility is an activity that falls within the plain text of the Second Amendment.") The Court thus turns its attention to step-two of the *Bruen* analysis.

The Supreme Court has repeatedly confirmed that the government may regulate firearms in "sensitive places," which include "government buildings." *Bruen*, 597 U.S. at 30 (quoting *Heller*, 554 U.S. at 626); *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("repeat[ing] th[e] assurances" in *Heller* that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are presumptively constitutional (cleaned up)). *Heller* proceeded to illustrate the sensitive places doctrine by referencing schools and government buildings but identified them "only as examples" that did "not purport to be exhaustive." *Heller*, 554 U.S. at 627 n.26. *Bruen* then offered "legislative assemblies, polling places, and courthouses," as additional "settled" examples of locations that are considered sensitive places, "where arms carrying could be prohibited consistent with the Second Amendment." *Bruen*, 597 U.S. at 30. *Bruen* then explained that courts can analogize

11

to these "longstanding laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" and "historic regulations of sensitive places to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* (cleaned up).

Defendants argue that *Heller*'s (and later *Bruen*'s) characterization of regulations targeting "sensitive places," including "government buildings," as "presumptively lawful," *Heller*, 554 U.S. at 627 n.26, creates a presumption that all government buildings, including post offices, are "presumptively constitutional," such that it is now Plaintiffs who carry the burden to overcome that presumption.[16] They also rely on *Antonyuk*, which relied on *Bruen* for the same language and "for the proposition that the tradition of regulating firearms in spaces frequented by children is also well-established and representative." 120 F.4th at 1026.

To the extent Defendants attempt to invoke this so-called presumption to supplant the *Bruen* framework or to suggest that the required historical inquiry may be dispensed with, the Court does not agree. While the *Heller* and *Bruen* references to "government buildings" are helpful examples of spaces where sensitive place restrictions are likely constitutional, they are not dispositive.[17] Although Defendants assert that no court has understood *Bruen* to narrow *Heller* and *McDonald* to only a subset of government buildings, the Court is likewise aware of no decision that has upheld a regulation targeting a government building solely on the basis

---

[16] ECF No. 28 at 7.

[17] Indeed, the Second Circuit has found that the "presumptively lawful" language in *Bruen*, in the context of shall-issue licensing regimes, meant that "shall-issue licensing regimes are presumptively constitutional." *Frey*, 157 F.4th at 140 (cleaned up). Accordingly, in the context of a preliminary injunction motion, the Second Circuit held that "plaintiff bears the burden of making at least *some* showing to overcome the presumptive constitutionality of a shall-issue licensing regime." *Id.* (cleaned up). However, the Second Circuit has not opined on whether this presumption applies in the context of any sensitive place restrictions.

of such a presumption, dispensed entirely with the history-and-tradition inquiry, or shifted the burden to the challenging party on that basis. Accordingly, the Court declines to adopt any such presumption or burden-shifting framework in this case and instead proceeds to apply the historical analysis required by Supreme Court precedent.

The Court holds that the challenged regulation here, the Federal Facility Ban, as applied to Post Offices, is in line with history and tradition. Specifically, the Second Circuit in *Antonyuk* concluded that our Nation has a "well-established and representative tradition of regulating firearms in public forums and quintessentially crowded places, enduring from medieval England to Reconstruction America and beyond." 120 F.4th at 1019. In so concluding, the Second Circuit first pointed to the Statute of Northampton, a British statute from 1328, which forbade going or riding "armed by night [ ]or by day, in fairs, markets." *Id.* (quoting Statute of Northampton 1328, 2 Edw. 3 c.3 (Eng.)). The *Antonyuk* court then looked at two states, Virginia and North Carolina, which both "passed statutes at the Founding that replicated the medieval English law prohibiting firearms in fairs and markets, *i.e.*, the traditional, crowded public forum." *Id.* at 1019–20 (citing 1786 Va. Acts 35, Ch. 49 (stating that "no man, great or small, of what condition," except ministers of justice, shall "go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the country"); Collection of Statutes of the Parliament of England in Force in the State of North Carolina, pp. 60–61, ch. 3 (F. Martin Ed. 1792) (stating that "no man great nor small," except ministers of justice, shall "bring no force in an affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets")); *see id.* at 1021 (observing that Virginia's and North Carolina's statutes "applied to over a quarter of the Nation's population").

Next, looking to the Reconstruction era, the Second Circuit found that three additional states (Texas, Missouri, and Tennessee) and two territories (Oklahoma and Arizona) similarly passed laws prohibiting weapons in public forums and crowded places. *Id.* at 1021–22; *see* 1869–70 Tenn. Pub. Acts 23 (prohibiting carriage of deadly weapons by "any person attending any fair, race course, or other public assembly of the people"); 1870 Tex. Gen. Laws 63 (prohibiting firearms in "place[s] where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering"); 1883 Mo. Sess. Laws 76 (barring firearms in "any school room or place where people are assembled for educational, literary or social purposes" and "any other public assemblage of persons met for any lawful purpose"); 1889 Ariz. Sess. Laws 17 (prohibiting carrying "a pistol or other firearm" to "any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election . . . or to any other public assembly"); 1890 Okla. Sess. Laws 496 (prohibiting carriage of a firearm in places "where persons are assembled for . . . amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering").

And "state courts of all three states that had such laws upheld this type of statute as constitutional." *Antonyuk,* 120 F.4th at 1021; *see Andrews v. State*, 50 Tenn. 165, 182 (1871) (upholding conviction under Tennessee law on grounds that "a man may well be prohibited from carrying his arms" to a "public assemblage, as the carrying [of] them to such places is not an appropriate use of them"); *English v. State*, 35 Tex. 473, 478–79 (1872) (upholding indictment under Texas law and noting that the Second Amendment does not guarantee the

14

"right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."); *State v. Shelby*, 90 Mo. 302, 2 S.W. 468, 469 (1886) (holding that the Missouri law prohibiting carriage "where people are assembled for educational, literary, or social purposes" was constitutional). These state supreme court decisions "during that period uph[olding] similar governmental practices against similar constitutional challenges" are "strong evidence of constitutionality." *Antonyuk*, 120 F.4th at 969.

Thus, the Second Circuit concluded that "[t]his long, unbroken line, beginning from medieval England and extending beyond Reconstruction, indicates that the tradition of regulating firearms in often-crowded public forums is part of the immemorial custom of this Nation." *Id.* at 1021 (cleaned up). In *Antonyuk* itself, the Second Circuit relied on this conclusion to hold that New York's prohibition of firearms in urban parks and theaters was likely constitutional. *Id.* at 1024. In *Frey*, decided the following year, relying on the same, the Second Circuit similarly held that New York City's prohibitions on firearms in Times Square and in its public transportation system were also consistent with the above history and tradition, and thus, likely constitutional. 157 F. 4th at 134–35.

The Court also notes that firearms were indeed restricted in several types of government buildings at the time of the Founding. In fact, laws prohibiting the carrying of weapons in places of government business trace their roots to 14th century England. In 1313, a law was passed providing that, for those who appear in Parliament, "every Man shall come without all Force and Armour." 7 Edw. 2, 170 (1313). That law was followed in 1328 by the Statute of Northampton, discussed above, which prohibited the carrying of arms "before the King's

15

justices" and "other of the King's ministers doing their office." *Bruen*, 597 U.S.at 40 (citing 2 Edw. 3 c. 3 (1328)). These propositions laid the groundwork for similar laws in the colonies. In 1647, for example, Maryland outlawed firearms in the House of Assembly during session. *See* 1647 Md. Laws 216; *see also* 1650 Md. Laws 273. In 1786, Virginia's legislature enacted a prohibition similar to the Statute of Northampton that forbade most people from "com[ing] before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms." 1786 Va. Acts 33, ch.21. In 1776 and 1778, Delaware and New York enacted laws that prohibited individuals from bringing arms to a polling place during an election. *See* Del. Const. Art. 28; Act of Jan. 26, 1787 N.Y. Laws 345. Similarly, in 1835, Providence, Rhode Island, decreed that "No person shall fire any gun, pistol, rifle or other fire-arm . . . on any public lands within said city[.]" The Charter and Ordinances of the City of Providence, with the Acts of the General Assembly Relating to the City Page 60, Image 61 (1835).

As for post offices, Plaintiffs correctly point out that though post offices have existed since before the Founding, they were not subject to firearm restrictions until 1972. That year, the U.S. Postal Service issued a regulation specifically banning arms on post office property. *See* 37 Fed. Reg. 24, 346-47 (1972); *see also* 29 Fed. Reg. 15, 982 (1964) (banning firearms in government buildings but not post offices specifically). And sixteen years later, Congress enacted the Anti-Drug Abuse Act of 1988, Section 6215 of which is the Federal Facility Ban challenged here.

But as Defendants assert, "the lack of Founding-era, post-office-specific firearm restrictions is neither dispositive nor surprising, because dedicated postal buildings were rare or non-existent at that time."[18] The British Government furnished no postal buildings in the

---

[18] ECF No. 28 at 27.

16

North American colonies, and the lack of dedicated accommodations continued long after the early American period. *See* ECF No. 28-9, Ruth Lapham Butler, *Doctor Franklin, Postmaster General* (1928). Letters were left at public gathering spots such as taverns or inns, and local postmasters exercised their office from private residences. *Id.* Rather than existing in "government buildings," early post offices "moved with any change of the Postmasters in charge." *Id*. The first known colonial post office was a private tavern and residence designated by the General Court of Massachusetts in 1639. *See* ECF No. 28-10, Post Off. Dep't, 7 Collections of the Mass. Hist. Soc'y 3, 48 (1838).

New York City's first post office, opened in 1642 and until 1804, was housed in a succession of coffee houses, seen at the time "as a temperate alternative to taverns." *See* ECF No. 28-11, James Bruns, *Great American Post Offices,* at xii & 3 (1998). Hanover, New Jersey's post office evolution, "typical of countless other small towns," is also illustrative: "Its first post office was opened in the late 1700s in a private home. It moved into a general store in the mid-1800s. The community did not finally receive its own separate federally-owned post office building there until 1950." *Id.* at xii. There are no federal records on the buildings occupied by most early post offices. *See* ECF No. 28-12 at 16, U.S. Postal Service, *Publication 119: Sources of Historical Information on Post Offices, Postal Employees, Mail Routes, and Mail Contractors*, at 14 (Nov. 2022). Until the early 1900s, most post office quarters were provided by the postmaster at no charge to the Post Office Department, often in the postmaster's home or other place of business, such as a general store. *Id*. Accordingly, the lack of firearm prohibitions in "post offices" at the time of the founding is not inconsistent with a contemporaneous understanding that firearms could nevertheless be restricted in "government buildings," which post offices would only later become. *See, e.g.*, *Bruen*, 597 U.S. at 30.

17

Today, U.S. Post Offices look very different than they did at the Founding. As of 2024, the United States Postal Service has over 30,000 post offices, most of which are directly operated by the federal government. *See* U.S. Postal Service, Postal Facts, https://facts.usps.com/print-all-facts/ (last accessed March 24, 2026) (Perma Link: https://perma.cc/2EFM-CGG6).[19] In 2024, the Postal Service reported 655.2 million customer visits. *Id.* And this number, calculated only based on the volume of transactions, likely significantly undercounts the true number of customer visits. "In reality, most visits do not include a transaction." Office of Inspector General, U.S. Postal Service, Billions Served: Foot Traffic at the Post Office (Sept. 11, 2017) (available at https://www.uspsoig.gov/reports/white-papers/billions-served-foot-traffic-post-office) (last accessed Mar. 24, 2026) (Perma Link: https://perma.cc/AG6N-ATQ6). "Instead," as in the case of Mr. Nastri, "customers may check a PO Box, pick up shipping materials, or deposit a letter in the slot." *Id.* In 2017, in a study utilizing a variety of proven methods to get a more accurate measure of foot traffic, the U.S. Postal Office estimated that annual foot traffic was about triple the Postal Service's official statistic. *Id.* Applying this adjustment to the 2024 data implies that actual foot traffic may have approached approximately 1.97 billion visits (655.2 million × 3) that year. On average, this means that each post office gets about 65,667 visits per year. Alternatively, assuming most post offices are closed on Sundays, about 6.3 million people in the United States on any given day visit a post office. In other words, any given post office sees approximately 200 visitors

---

[19] The Court may take judicial notice of statistics publicized on the USPS website. *See Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 299 n.7 (2d Cir. 2022) ("A court may take routine judicial notice of documents retrieved from official government websites." (cleaned up)); *see also Cangemi v. United States*, 13 F.4th 115, 124 n.4 (2d Cir. 2021) (taking judicial notice of statistics on government website).

per day. We, as a Nation, have come a long way from the era when post offices were housed in private homes, taverns, or coffee shops.[20]

Given these statistics, modern post offices are quintessentially crowded public places, akin to the "fairs, markets," and other public forums where firearms were historically regulated. Even if post offices do not confine individuals as tightly as a subway car or assemble them for a common purpose over a fixed duration like churches or theaters, they remain high-traffic environments characterized by a steady and substantial flow of the public. The Second Circuit's reasoning in *Antonyuk* and *Frey* is thus therefore directly applicable here. Just as the Second Circuit held that New York's prohibition on firearms in parks, theaters, Times Square, and public transportation systems was consistent with our Nation's history and tradition of firearm regulation in sensitive places characterized by the presence of dense or continuous public congregation, this Court similarly concludes that the federal prohibition on firearms in post offices is a constitutional restriction in a "sensitive place." Post offices are not merely "government buildings" in the abstract; they are bustling hubs of public activity where the government has a strong interest in ensuring safety and order, consistent with the historical analogues identified in *Antonyuk* and *Frey*.

---

[20] Plaintiffs assert that they "have provided the Court with uncontroverted and admitted evidence that Post Offices still integrate into the community in similar ways" as during the Founding because "[t]hey share spaces with ordinary mixed commercial and retail establishments like pizza restaurants, salons, and convenience stores." ECF No. 29 at 15. The Court disagrees, for all the reasons discussed. Additionally, the Court notes that the "evidence" Plaintiffs refer to, to the extent it comes from their Statement of Material Facts, has been objected to by Defendants and is thus not necessarily "uncontroverted and admitted." *See, e.g.,* ECF No. 28-1 ¶ 28. But even assuming as true that post offices today frequently neighbor other business, the Court's conclusion here is not altered. Just because standalone post offices may "share space" with other businesses in that they neighbor or are located close to those businesses, the very fact that they are now standalone facilities frequented by thousands of people (and not embedded *within* those business or people's private homes) is itself demonstrative of just how much they have changed.

As for the "why" behind the Federal Facility Ban, the record and briefing are sparse as to potential explanations behind the statute. The U.S. District Court for the Middle District of Florida has posited that the Federal Facility Ban "could reasonably be understood to target one of three problems." *Ayala*, 711 F.Supp.3d at 1341. "First, Congress might have sought to promote public safety generally." *Id.* Second, the statute, as applied to post offices, may have been addressing a concern consisting of "some combination of postal-employee safety and ensuring the efficacy of mail delivery." *Id.* Finally, Congress, in enacting the Federal Facility Ban, may have sought to "address . . . intimidation during official government proceedings." *Id.* at 1942.

The Court finds that the first and third explanations—promoting public safety generally and preventing intimidation in the course of official government functions—are firmly grounded in the historical tradition discussed above. From the Statute of Northampton through Reconstruction-era regulations, governments consistently restricted the carrying of firearms in places where large numbers of people gathered or where official civic functions were carried out, based on concerns about public disorder, fear, and the potential for coercion or intimidation. These historical regulations reflect a well-established understanding that the presence of arms in such settings posed distinct risks to both public safety and the orderly administration of government activities. Post offices, as modern sites of continuous public congregation and essential government operations, implicate these same concerns.

The Court further concludes that the "how" of the Federal Facility Ban—an outright prohibition on the possession of firearms within these spaces—is likewise consistent with historical practice. The analogues identified above did not merely impose time, place, or manner restrictions, but in many instances categorically barred the carrying of arms in

20

designated sensitive locations, including public assemblies, polling places, and buildings where government business was conducted. In this respect, the Federal Facility Ban is not a novel or outlying measure, but rather a modern application of a longstanding regulatory approach. Accordingly, the statute, as applied to post offices, fits comfortably within this Nation's historical tradition of firearm regulation and does not violate the Second Amendment.

### D.       Plaintiffs' Theory of "Sensitive Places"

The Court rejects Plaintiffs' assertion that "*Bruen* postulated that governments could categorically bar weapons altogether in only three sorts of locations during the Founding Era: legislative assemblies, polling places, and courthouses."[21] Plaintiffs go on to extrapolate, based on these places, that the only "sensitive places" where Congress can prohibit firearms are "critical forums where the core decisional processes of our republican institutions take place" that are "enclosed, secured locations protected by government-provided comprehensive security."[22]

First, the Court rejects Plaintiffs' argument on textual grounds. The relevant portion of *Bruen* Plaintiffs rely on reads as follows:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626, 128 S.Ct. 2783. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.,* legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); see also Brief for Independent Institute as *Amicus Curiae* 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment.

---

[21] ECF No. 26-1 at 18.

[22] *Id.* at 18, 19.

*Bruen*, 597 U.S. at 30. But it is clear from this text that legislative assemblies, polling places, and courthouses are merely *examples* of sensitive places. In fact, the Supreme Court first provides "schools and government buildings" as examples of these sensitive places, and then proceeds to designate, by their use of "e.g.," legislative assemblies, polling places, and courthouses as further examples, ones where the Court has located historical prohibitions on weapons. The Court thus finds it incorrect to suggest that *Bruen* limited categorical firearm prohibitions to only three types of locations—legislative assemblies, polling places, and courthouses. At a minimum, that characterization omits "schools," which the Supreme Court expressly identified as another paradigmatic example of a sensitive place. And *Bruen* did not purport to provide an exhaustive list of such locations. Rather, it used open-ended language that permits inclusion of other sensitive places and identified certain historically grounded examples while reaffirming that courts may reason by analogy to determine whether modern locations qualify as sensitive places. Accordingly, the fact that post offices are not specifically enumerated in *Bruen* does not resolve the constitutional question posited here. As explained above, the relevant inquiry is whether regulations governing modern post offices are consistent with this Nation's historical tradition of firearm regulation. For the reasons already discussed, the Court concludes that they are.

The Court also agrees with the Defendants that Plaintiffs' test fails on its own terms. Specifically, Defendants assert that all of the relevant locations—legislative assemblies, polling places, and courthouses—"were enclosed, secured locations protected by government-provided comprehensive security."[23] In other words, they seem to assert that if the government provides armed security someplace, including, critically, that it "screen[s] for weapons," that

---

[23] ECF No. 26-1 at 19.

makes a place "sensitive" such that the government can then prohibit firearms carriage.[24] But their theory doesn't square with the very examples they provide. While it is certainly true that the government, today, provides security in most courthouses, the same can't be said about legislative assemblies and, especially, polling places. "Millions of Americans vote in high school gymnasiums, churches, municipal offices, recreation centers, and other places that would never qualify as 'secured locations protected by government-provided security.'"[25] The Plaintiffs concede that polling places are proper examples of sensitive places, but then assert that "comprehensive security *at a minimum* is required for a place to be deemed sensitive."[26] If, then, polling places today don't have comprehensive security, but are still considered to be sensitive places, surely it is not by virtue of the comprehensive security that they lack.

Additionally, largely for the reasons pointed out by Defendants, there is a lack of historical support for Plaintiffs' assertion that any Founding-era government provided "security," let alone "comprehensive security," for legislative assemblies, polling places, and courthouses.[27] Take, for example, Plaintiffs' lengthy string cite described as a list of "statutes compensating law enforcement to attend and provide security for legislatures."[28] In fact, however, none of the cited statutes contain any language requiring government officials to provide security for the relevant legislative assemblies. But Plaintiffs provide no pin cites or quotes for two of the statutes. And the remaining seven examples are indeed, as Defendants

---

[24] *Id.* at 17.

[25] ECF No. 28 at 10.

[26] ECF No. 26-1 at 19.

[27] ECF No. 28 at 15–22.

[28] ECF No. 26-1 at 19.

assert, "fee schedules that compensate various types of officers for attending proceedings."[29] *See* ECF No. 26-2, Ex. 1 at 3 (Rhode Island), Ex. 19 at 95 (Delaware), Ex. 8 at 36 (Pennsylvania), Ex. 5 at 18 (South Carolina), Ex. 9 at 40 (New York), Ex. 7 at 31 (Georgia), and Ex. 2 at 7 (New Jersey). The Rhode Island legislature, for example, simply authorized compensation of $1/day for any sheriff attending the General Assembly or court proceedings and $0.75/day for any town sergeant or constable doing the same. *Id.* at 5–6.

Additional examples authorizing these fee schedules abound among Plaintiffs' evidence. *See, e.g., id.* at 39 (fee schedule for sergeant-at-arms in Pennsylvania); *id.* at 101 (fee schedule for door-keeper in Rhode Island). But none of the examples listed by Plaintiffs compel or require any officer to be present for legislative assemblies, let alone describe the type of "comprehensive security" being provided at such assemblies. "Sergeant-at-arms" or "door-keeper" in the above statutes, for example, are not defined. Crucially, none of the statutes provided require the officers to be "armed." And Defendants provide evidence that at least in one state, a doorkeeper's function was to "supply[] wood for the use of the General Assembly and maintain[] the furniture," and that on one occasion that doorkeeper was also "paid separately for crafting a chair for the Speaker." *See* Archives of Maryland (Biographical Series): Cornelius Mills (c.1755-1823) (cleaned up). That same doorkeeper, Cornelius Mills, contemporaneously worked as a "carpenter, joiner, ran a boardinghouse, and advertised his experience as an auctioneer." *Id.* And though nothing in the historical record suggests Mr. Mills had any law enforcement experience, he was later appointed as the sergeant-at-arms for the House of Delegates. *Id.* On this evidence, the Court is not persuaded that the presence of a "door keeper" or "sergeant at arms" alone was enough to supply the "comprehensive

---

[29] ECF No. 28 at 15.

government security" Plaintiffs rely on, and Plaintiffs' reply offers no evidence to rebut this conclusion.

Even with respect to courthouses, where Defendants acknowledge that at least some Founding-era governments required sheriffs to "attend" the "courts," the Court is not persuaded that the nature of the sheriff attendance satisfies the test set forth by Plaintiffs. Three of the listed statutes—examples from South Carolina, Virginia, and Delaware—do not elaborate on what attendance by a sheriff actually entails, or how that attendance "secures the courthouse." At least one of the examples suggests that attending court had more to do with the process of court proceedings rather than the security of the courthouse. *See id.* at 99 (Delaware's statute compelling attendance of the Sheriff of Kent County "on the said High Court of Errors and Appeals during the sitting thereof, *and be the officer for the purpose of executing the . . . process of the said court*") (emphasis added).

Additional examples, as correctly pointed out by the Defendants, also suggest that "attend" connoted ministerial and administrative duties. *See, e.g., id.* at 42 (New York statute requiring sheriffs to bring grand and petit jurors to court, transport prisoners, facilitate witnesses, etc.); *id.* at 38 (Pennsylvania statute requiring sheriff to summon a grand jury, but not even to "attend" court proceedings); *id.* at 94; ECF No. 28-7, *Laws of New Jersey* 50–51 (1811) (New Jersey statute requiring "constables" to "be the ministerial officers of the said court," and specifying the constables' roles as to "execute and return all precepts, summons, warrants, writs and other process, issuing out of the said court, and to them or any of them directed and delivered, and to perform all matters, acts, and things appertaining to their offices aforesaid."). It is not evident to the Court, from any of the examples provided by Plaintiff, how

25

the statutes reflect that the officers mentioned therein were to keep the courthouse safe as a general matter, let alone to provide "comprehensive security."

Finally, Plaintiffs' historical evidence with respect to polling places fares no better. Plaintiffs principally rely on statutes from Georgia and Maryland requiring sheriffs to attend elections to preserve order. *See* ECF No. 28-2 at 85 (Georgia) ("[T]he sheriff of each county or his deputy, is required to attend at such elections, for the purpose of enforcing the orders of the presiding magistrates in preserving good order."); Md. Const. art. I § 14 (1776) ("[T]he Sheriff of each county, or in case of sickness, his Deputy (summoning two Justices of the county, who are required to attend, for the preservation of the peace), shall hold and be judge of the said election[.]"). But those isolated examples only highlight the lack of any consistent historical practice. Notably, Plaintiffs' own evidence shows that Georgia required a sheriff's presence at polling places but not at legislative assemblies, undermining any claim of a uniform "sensitive places" framework tied to government-provided security. *See* ECF No. 26-1 at 15–16. Moreover, neither the Georgia nor Maryland provisions required that attending officials be armed, a necessary predicate to Plaintiffs' theory of "comprehensive security."

The remainder of Plaintiffs' polling-place evidence further weakens their position. The Virginia statute, for example, required a sheriff to "attend" a limited category of local elections, but only to administer the voting process—recording ballots and reporting results—not to provide security. *See* ECF No. 26-2 at 47. Similarly, the New Jersey statute authorized election officials to commit disorderly individuals to a constable's custody but did not require any constable to be present, let alone armed. *See* ECF No. 28-8. And the examples from Delaware and South Carolina likewise fail to establish any security requirement: Delaware required sheriffs to "attend, conduct, and regulate" elections without specifying a law-enforcement role,

26

while South Carolina's provisions merely set compensation for publishing writs and administering election procedures. *See* ECF No. 26-2 at 97 (Delaware); *id.* at 21–23 (South Carolina). Taken together, these examples reflect a range of administrative and procedural duties, not a historical tradition of armed, on-site security at polling places, much less the sort of "comprehensive security" Plaintiffs assert is constitutionally required.

In sum, the Court does not find any historical or precedential support for Plaintiffs' theory of sensitive places and, noting that it would significantly curtail *Heller*, *McDonald*, *Bruen*, and *Rahimi*, declines to adopt it.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 28) and **DENIES** Plaintiffs' Motion for Summary Judgment (ECF No. 26). The Clerk of Court is respectfully directed to issue judgment accordingly and close this case.

**SO ORDERED.**

Hartford, Connecticut
March 25, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

27